LUTTIG, Circuit Judge,
concurring in
the judgment in part and dissenting from the judgment in part:
I concur in the opinion of the court that the Charlotte-Mecklenburg School System is now unitary, following 35 years of federal court supervision. I also agree with the conclusion reached by Judge Traxler that the School Board acted without the required authorization from the district court both when it created its expansive magnet school program and when it imposed a fixed quota to govern admissions to that program. Neither the creation of the magnet school program nor the imposition of a rigid quota governing admission into that program were authorized by the district court, and both clearly constituted “material changes” from the district court’s prior remedial orders, requiring prior court approval. I also agree with Judge Trader’s narrowest conclusion that, absent a proven necessity for such, an admissions program that permanently employs fixed ratios to deny certain students, solely because of their race, the opportunity to compete for seats that will otherwise be left unfilled even after all targeted minorities have been allotted seats (and I assume fixed ratios in a remedial context to be constitutional), is insufficiently tailored to withstand scrutiny.
I address myself separately only to the question whether the district court authorized the strict mathematical quota adopted by the School Board in 1992 to govern admissions to Charlotte-Mecklen-burg’s magnet school program, a quota that, as noted, required officials literally to leave seats unfilled even after all interested minority students had been afforded an opportunity to attend the magnet school of their choice.
I.
With respect to the magnet school program’s admission policy, the holding of the district court that we review is that that court had “firmly rejected the use of rigid racial quotas,” 57 F.Supp.2d 228, 286 (W.D.N.C.1999), and that, in contravention of those orders and the Supreme Court’s decision in Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 25, 91 S.Ct. *365 1267, 28 L.Ed.2d 664 (1971), the School Board had “us[ed] mathematical ratios not as a starting point but as an ending point.” 57 F.Supp.2d at 289. “In policy and in practice, the[magnet schools’] 60/40 ratio requirement [was] an inflexible quota[,]” the district court found, id. at 288, and “slots reserved for one race [would] not be filled by students of another race.” Id. at 289. Indeed, the court observed, “it was not uncommon for the school year to begin with seats remaining vacant because students of one race would disrupt the desired racial balance.” Id. Accordingly, the district court held that the magnet school program constituted a “material departure” from the court’s prior remedial orders. Id. at 287.
As to whether the rigid quota imposed by the School Board was authorized by the district court, the question is not whether the court’s orders authorized race-conscious admission decisions, as the School Board argues, see Br. of Appellants Charlotte-Mecklenburg Board of Education, et al. at 20 (“The particular desegregation tool struck down by Judge Potter — magnet schools with race conscious admissions guidelines — has been repeatedly recognized by the Supreme Court and other courts as a valid exercise of the broad remedial discretion of both district courts and school authorities.”), and as Judge Motz and Judge Wilkinson contend by way of strawman. It is indisputable that race-conscious admission decisions were authorized by the district court’s orders; not even the plaintiffs argue that they were not. Neither is the question whether parties are required to obey court orders, the only question addressed by the authorities relied upon by Judge Motz; of course, they are. Nor is the question whether quotas were “foreclosed” by the district court’s orders, as Judge Wilkinson alternatively maintains; it should be evident that a party does not receive immunity for any and all conduct that is merely unforbidden by judicial order.
And finally, the issue is not whether racial quotas are or are not constitutional. There simply is no occasion in this case for a general expression of viewpoint as to the use of racial quotas and, although I am given pause over Judge Wilkinson’s express and categorical rejection of racial quotas, whatever the circumstance, I certainly express no such general view herein. I might well be presented with circumstances in which I would conclude that racial quotas were essential to the vindication of constitutional right. And I would be most reluctant to foreclose myself from such a conclusion in an appropriate circumstance by statements in a case in which the issue was not even before the court.
Rather, the only issue relevant to the question of whether the School Board is entitled to immunity is whether the district court specifically authorized the School Board’s imposition of rigid quotas (i.e., whether the Board was acting pursuant to court order in imposing the fixed quotas), which denied students the opportunity to compete for unfilled seats solely because of their race. If the court did specifically authorize the use of fixed quotas, then the School Board is entitled to immunity; if it did not, then immunity is unavailable. The authorities on this score are uniform. See, e.g., McCray v. Maryland, 456 F.2d 1, 5 (4th Cir.1972) (observing that the law provides immunity for those whose actions are taken “in obedience to a judicial order or under the court’s direction”); see also Rogers v. Bruntrager, 841 F.2d 853, 856 (8th Cir.1988) (holding that clerks of court are immune from damages arising from acts they are “specifically required to do under court order at a judge’s direction”) (internal citations omitted) (emphasis added); Lockhart v. Hoenstine, 411 F.2d 455, 460 *366 (3d Cir.1969) (providing immunity for officers who act “pursuant to” a court order); cf. DeFelice v. Philadelphia Bd. of Educ., 306 F.Supp. 1345 (E.D.Pa.1969) (extending immunity to school boards that take actions pursuant to an order of a state commission). Compare Wilkinson v. Forst, 832 F.2d 1330, 1334 (2d Cir.1987) (granting immunity to officers who conducted searches “specifically authorized” by court orders) with Wooley v. City of Baton Rouge, 211 F.3d 913, 927 (5th Cir.2000) (denying immunity to officers who removed a child from a home without “specific authorization” by a court). Whether racial quotas are, as a general matter, constitutional has nothing whatsoever to do with the resolution of this issue. If the district court authorized strict racial quotas, then the School Board is entitled to immunity whether or not such strict quotas are constitutional.
Judge Wilkinson misunderstands this issue altogether, as is evident from both his extended and unnecessary discussion of racial quotas in general and his mistaken observation that I “insist” “the issue here has solely to do with racial quotas.” Judge Motz, in contrast, understands the issue presented, but errs in its resolution because of a reliance upon fundamentally inapplicable authorities.
II.
Most certainly the district court did not specifically authorize the School Board to employ fixed quotas in the admission of students to its magnet schools, as the district court itself held. There is not even an argument that it did. Indeed, although fatal to them holding that the board is entitled to immunity, Judges Motz and Wilkinson do not even suggest otherwise. Nor could they.
Not only the very district court in question, but the Supreme Court of the United States itself in this very litigation, both explicitly and consistently disavowed the use and constitutional legitimacy of rigid quotas throughout the thirty-plus year history of Charlotte-Mecklenburg’s desegregation efforts. In fact, in the course of this very litigation, even the Charlotte-Mecklenburg School Board has strenuously argued against the fact and the constitutionality of any judicially-imposed quotas by the district court.
A.
Beginning over thirty-two years ago, in this identical litigation, Judge McMillan himself acknowledged the well-recognized and well-understood distinction between race-conscious decisions and rigid quotas, which is ignored by Judge Motz and variously ignored and misunderstood by Judge Wilkinson today. And he could not have been clearer that he would permit the former in pursuit of integration of the Charlotte-Mecklenburg school system, but forbid the latter — and he never wavered from that position. Said Judge McMillan at that time, in terms whose import is unmistakable for the issue before us, although “[r]ace may be considered in eliminating segregation in a school system,” Swann v. Charlotte-Mecklenburg Bd. of Educ., 306 F.Supp. 1299, 1312 (1969), “[flixed ratios of pupils will not be set.” Id. (emphasis added). Judge McMillan’s words bear repeating: “Fixed ratios of pupils will not be set.” And in emphasis of the distinction he drew between fixed ratios and race-consciousness, he noted that although “efforts should be made to reach a 71-29 ratio in the various schools so that there will be no basis for contending that one school is racially different from the others, [it is necessary] to understand that variations from that norm may be unavoidable.” Id. (emphasis added).
*367 Only two months later, Judge McMillan repeated that his order “[was] not based upon any requirement of ‘racial balance,’ ” Swann v. Charlotte-Mecklenburg Bd. of Educ., 311 F.Supp. 265, 267 (1970). He explained in no uncertain terms that the earlier-referenced 71-29 ratio, which our court today holds specifically authorized imposition of an inflexible quota, was merely a starting point in pursuit of the goal of desegregation. See id. at 267-68.
And a year later, Judge McMillan again explicitly rejected fixed, rigid quotas, reemphasizing that “ ‘racial balance’ is not required by this court.” Swann v. Charlotte-Mecklenburg Bd. of Educ., 318 F.Supp. 786, 792 (1970). Indeed, the court recited, the previous order “expressly contemplated wide variations in permissible school population.” Id.
B.
Not only did Judge McMillan, in his own orders, repeatedly reject the use of fixed quotas, the Supreme Court of the United States, in reviewing Judge McMillan’s orders, categorically rejected even an urged construction of these orders that would authorize fixed quotas. In reviewing Judge McMillan’s Order of February, 1970 (Swann v. Charlotte-Mecklenburg Bd. of Educ., 311 F.Supp. 265 (1970)), the Supreme Court unambiguously stated, in a passage that should be dispositive of whether the district court previously, and certainly at any time thereafter, specifically (or otherwise) authorized the use of quotas, that it affirmed Judge McMillan’s order only on the condition that it not be read to authorize fixed rigid quotas:
If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.
Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 24, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (emphasis added); see also Winston-Salem/Forsyth County Bd. of Educ. v. Scott, 404 U.S. 1221, 1227, 92 S.Ct. 1236, 31 L.Ed.2d 441 (1971) (Burger, C.J., in Chambers) (describing as “disturbing” the School Board’s “understanding that it was required to achieve a fixed ‘racial balance’ that reflected the total composition of the school district”). Only a “very limited use” of “mathematical ratios,” as a “starting point,” was within the “equitable remedial discretion of the District Court,” id. at 25, 91 S.Ct. 1267, held the Supreme Court.[1]
And, in perhaps the most powerful testament of all to the fact that this district court never intended, much less specifically authorized a quota of a type the majority holds today that it did, the School Board itself expressly argued to the Supreme Court of the United States in Swann both that Judge McMillan “disclaim[ed] any intent to require racial balancing,” Respon *368 dent’s Br. at 24, and that the plain language of the district court order dealing with student enrollment (“about or above 20%”) actually did not set quotas.[2] Indeed, the Board that before this court argues that racial quotas were authorized by Judge McMillan, argued before the Supreme Court that it was beyond the constitutional authority of the district court to impose quotas (“absolutes”), as such would have been based on the district court’s own “subjective” notions of right and wrong, not on the mandates of the Constitution, Respondent’s Br., at 35, and would violate individual rights guaranteed by the Fourteenth Amendment “of those blacks and whites caught up in the forced mass movement of children away from their neighborhoods.” Id. at 52, 91 S.Ct. 1267. In an observation that now acquires ironic overtones of its own in light of the School Board’s current posture that quotas were authorized by the district court, the Board in Swann argued with respect to its position (also rejected by the Supreme Court) that, although not intended by Judge McMillan, his order should nonetheless be construed as effectively requiring racial balancing, that “[i]t is ironic that the counterpart of the compulsion outlawed by Brown I and II is now employed in the name of the Constitution. Is it trite to suggest that two wrongs do not make a right?” Id.
C.
If there were any question as to Judge McMillan’s rejection of fixed quotas, and frankly there can be none in the face of Judge McMillan’s own disavowal and the Supreme Court’s explicit condemnation of such in Swann, it was answered with equal clarity repeatedly by the district court in orders entered in the wake of Swann, in which the court was at obvious and undeniable pains to respect the Supreme Court’s injunction that inflexible quotas not be set.
In an order issued the same month after the Supreme Court’s decision in Swann, Judge McMillan again confirmed that he neither authorized nor permitted strict racial quotas. First, when the School Board asked to close a school to improve racial balance, Judge McMillan rejected the proposal decisively, finding deviations from targeted percentages an insufficient justification for such action. Swann v. Charlotte-Mecklenburg Bd. of Educ., 328 F.Supp. 1346, 1348 (1971) (refusing to close a school where the number of white students was less by two percent than that assigned to the school in the beginning of the year and one percent greater “than the proportion called for under the plan”). And in language that belies any contention that the court authorized strict quotas, Judge McMillan rejected a flat ban on any student transfers that would alter the targeted composition of a school, instead ordering only that the School Board could not assign a child to a school or allow that child to attend a school different from the one he was attending at the start of the school year, if “the cumulative result of such assignment in any given period tends substantially to restore or to increase the degree of segregation in either the trans-feror or the transferee school.” Id. at 1350 (emphasis added).
*369 Two years later, Judge McMillan employed essentially the same carefully crafted language, again distinguishing between “racial identifiability” on one hand and strict quotas on the other, Swann v. Charlotte-Meckleriburg Bd. of Educ., 362 F.Supp. 1223, 1228-30 (1973), invoking the language of “reasonably stable [pupil distribution],” “substantial [leeway for use of discretion and common sense],” and “[remedy for] gross unfairness [as the ‘legitimate target of a court,’ as contrasted with ‘perfect fairness’ which is ‘impossible to attain’].” Id. at 1229, 1231, 1238.
And, finally, in 1974, the district court entered the order that the School Board contends, and Judges Motz and Wilkinson accept, authorized the rigid quotas in dispute. Contrary to the Board’s assertion and my colleagues’ belief, however, that order, too, likewise carefully and deliberately preserved the elementary distinction between flexible ratios as a starting point to bring segregation to an end, which the Supreme Court had held were constitutionally permissible, and strict quotas, which the Supreme Court had held were constitutionally impermissible. Retaining just that amount of flexibility essential to the exercise of what the Supreme Court only two years before had admonished was the limit of its constitutional power, Judge McMillan ordered only “[t]hat the optional school enrollments will be controlled starting with 1974 so that they are open to all county residents and have about or above 20% black students.” Swann v. Charlotte-Mecklenburg Bd. of Educ., 379 F.Supp. 1102, 1104 (1974) (emphasis added). Fully aware that the Supreme Court had forbidden imposition of quotas, the School Board itself did not even request authorization to impose strict quotas. Tellingly, the Board only submitted for the district court’s approval a policy requiring that each school maintain a black student population of “at or above approximately 20%.” To anyone familiar with the history of the litigation, and especially the Supreme Court’s then-recent explicit rejection of any construction of Judge McMillan’s orders that would impose a quota on the School Board, as was the School Board, the purposeful distinction between race consciousness and rigid quota drawn by Judge McMillan in his 1974 order could not be any clearer.
III.
Indeed, foregoing the implausible arguments embraced by the majority, not even the School Board seriously argues before us that the district court authorized strict quotas — which should be unsurprising, given its own argument as early as 1970 that such were unconstitutional and its firsthand knowledge that the Supreme Court had categorically rejected the use of such in this very litigation. To the Board’s credit, it does not even attempt the argument made by Judges Motz and Wilkinson that the language of the district court orders itself authorized quotas. Rather than focus on whether the district court orders imposed or authorized rigid quotas, as to which it says nothing, the Board noticeably and notably passes instead to the very different argument that its admission policies were not, as a practical matter, tantamount to insistence upon rigid quotas as evidenced by the ultimate variation in the racial make-up of the magnet schools. See Appellants’ Reply Br. at 15; Appellants’ Br. at 21 (suggesting that the “manner in which CMS admitted students to its magnet schools was fully consistent with these orders and not rigid and inflexible” because of the existence of “[significant variance” from the initial goal). This “[significant variance,” of course, is not due to the flexibility of the admissions process, but instead to its rigidity to the extent of leaving unfilled seats that were reserved for a particular race, even in the face of a *370 waiting list of students of different races. In any event, the ultimate demographics have no relevance whatever to the threshold question before us of whether the district court did or did not specifically authorize the Board to employ rigid quotas in admissions to its magnet schools — a question as to which the School Board’s silence speaks volumes.
IV.
The facts of the repeated explicit and consistent rejection of quotas by this district court in this very litigation for over thirty years; the categorical rejection by the Supreme Court of the United States of any construction of the district court’s orders that would require rigid quotas; the School Board’s own argument before the Supreme Court in Swann that rigid quotas were never intended or ordered by the district court, and that, if they had been, such would be unconstitutional; and the Board’s tacit (and frankly, candid, if indirect) concession in its briefs before this court that the district court did not authorize rigid quotas, renders beyond any argument the plaintiffs contention that the School Board acted outside the scope of the district court’s orders when it adopted rigid quotas and refused to permit students to compete for open seats based upon their race alone. Not merely had the district court never authorized the School Board’s use of rigid quotas. It had expressly stated that it would not do so, as the Board itself knew well. And, if this alone were not enough, at this very School Board’s behest, the district court had been instructed by no less an authority than the Supreme Court of the United States that it would have been without the constitutional power to impose such an inflexible requirement on the county officials of Charlotte-Mecklenburg, even had it wanted to. The holding on this record that the district court authorized the use of strict quotas is, as best evidenced by the palpable lack of support summoned by the combined opinions of Judges Motz and Wilkinson on behalf of that holding, simply insupportable.
“The cumulative message of innumerable court orders conveyed to the Charlotte-Mecklenburg board over the course of many years” actually was not, as Judge Wilkinson asserts, “to do everything possible to desegregate Charlotte schools.” Post at 366. It was to do “everything possible” to desegregate Charlotte-Meck-lenburg’s schools, except employ strict racial quotas.
DIANA GRIBBON MOTZ & KING, Circuit Judges:
A majority of the Court today reverses the district court’s finding that the use of a race-based admission policy by the Charlotte-Mecklenburg Board of Education (“CMS” or “Board”) in its expanded magnet schools program violated the Equal Protection Clause of the Constitution of the United States — and thus vacates the attendant injunction, monetary relief, and attorney’s fees award. Every significant aspect of the expanded magnet schools program, including the use of racial proportions in assigning students to magnet schools, was authorized by the judicial desegregation orders governing this case. The Board’s obligation to obey these court orders insulates it from constitutional attack for actions taken in compliance with them. It would be the rankest injustice to find the Board liable for a constitutional violation, and subject to monetary damages and enormous attorney’s fees, when its expanded magnet schools program was simply a good-faith attempt to comply with the desegregation orders imposed by federal courts to remedy an unlawful dual school system. Thus, for the reasons *371 more fully explained in parts III, IV, V, and VI of this opinion, the magnet schools ruling must be reversed and the accompanying injunction, monetary damages, and attorney’s fees award must be vacated.
However, a separate majority severely errs in upholding the district court’s determination that CMS has achieved unitary status. This majority expresses its “satisfaction that CMS has dismantled the dual school system.” Traxler Op. at 7. For the reasons set forth in parts II and VIII of this opinion, no one should be satisfied at this time. Nothing yet demonstrates that CMS has eliminated all vestiges of the unlawful discrimination that has long permeated its school system. In holding to the contrary, the majority has only succeeded here in dashing the hopes of the citizens of Mecklenburg County, particularly those of African-American descent, who have long fought for the fair and equitable implementation of the desegregation plan approved by Judge McMillan some thirty years ago. These successive generations of parents and children have been slowly starved by a well-meaning— but irresolute — governing body, whose sins have been absolved by the court below (and now by a majority of this Court) without anything but the most cursory examination. Although CMS has clearly achieved unitary status in certain respects, there remain several areas of primary concern that have not been subjected to anything approaching a proper constitutional analysis. We deplore, and believe the Court itself may one day regret, the refusal of a present majority to recognize this.
I.
A.
In order to better understand the issues presented in this case, we must briefly review our country’s history of school desegregation litigation, in which CMS has played a prominent role.
Even after slavery had been abolished for almost a full century, African-American children were, for the most part, either excluded from the public schools or educated separately from white children. “In fact, any education of Negroes was forbidden by law in some states.” Brown v. Bd. of Educ., 347 U.S. 483, 490, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (“Brown I”); see also Martin v. Charlotte-Mecklenburg Bd. of Educ., 475 F.Supp. 1318, 1324 (W.D.N.C.1979) (“For three centuries racial segregation was the law of the land.”). Indeed, throughout the early part of the 1900s, CMS operated a segregated school system within the safe harbor created by the Supreme Court’s doctrine of “separate but equal” articulated in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896).
In the middle of the 1900s, the Supreme Court began dismantling the great wall of segregation constructed under the imprimatur of Plessy. The Court initially sought to determine whether various “separate” African-American schools were genuinely “equal” to white schools by evaluating the quality of physical facilities, curricula, faculty, and certain “intangible” considerations. See, e.g., Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950); Sipuel v. Board of Regents of Univ. of Okla., 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247 (1948). In each instance, the Court concluded that they were not. Id.
In 1954, the Supreme Court at last overruled Plessy, declaring that “in the field of public education the doctrine of ‘separate but equal’ has no place. Separate educational facilities are inherently unequal.” Brown I, 347 U.S. at 495, 74 S.Ct. 686. Just one year later, the Court mandated that federal courts and school authorities take affirmative steps to achieve desegre *372 gation. Brown v. Bd. of Educ., 349 U.S. 294, 299, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (“Brown II ”) Specifically, federal courts were to retain jurisdiction over desegregation cases during the period of transition, wielding their equitable powers to supervise school boards’ efforts to effectuate integration. Id. at 300-01, 75 S.Ct. 753. One of the most important obligations of the federal courts was to ensure that school boards were proceeding in good faith to desegregate the public schools “with all deliberate speed.” Id. at 301, 75 S.Ct. 753. With these seminal decisions— Brown I and Brown II — the Supreme Court promised the citizens of this country, and particularly African-American children, school systems “in which all vestiges of enforced racial segregation have been eliminated.” Wright v. Council of the City of Emporia, 407 U.S. 451, 463, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972).
Notwithstanding the Court’s repeated admonition that segregation and its vestiges be eliminated “root and branch,” Green v. County Sch. Bd. of New Kent County, 391 U.S. 430, 437-38, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), many school boards— CMS included- — adopted “an all too familiar” response to the mandate of Brown II, interpreting “all deliberate speed” “as giving latitude to delay steps to desegregate.” Freeman v. Pitts, 503 U.S. 467, 472, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). And so, lower federal courts, with the guidance and oversight of the Supreme Court, began fashioning equitable remedies to contend with school board recalcitrance. For example, in Gixen, the Supreme Court held that a “freedom of choice” plan, which permitted students — regardless of race— to choose the school they would attend, was by itself insufficient to meet the mandate of Brown. 391 U.S. at 430, 88 S.Ct. 1689. In so holding, the Court recognized that more intensive efforts would be necessary in order to make “meaningful and immediate progress toward disestablishing state-imposed segregation.” Id. at 439, 88 S.Ct. 1689. Subsequently, in this very case, the Court approved significant federal court intervention into a school system in order to eliminate segregation “root and branch,” including the busing of students from schools close to their homes to schools farther away, the use of race-based “mathematical ratios,” and the alteration of student attendance zones. Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15, 25, 28, 30-31, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).
The Supreme Court has made clear, however, that a federal court’s “end purpose must be to remedy the violation and, in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution.” Freeman, 503 U.S. at 489, 112 S.Ct. 1430. Hence, as a school system eliminates the vestiges of past official segregation from certain facets of its operations, courts possess the authority to relinquish supervision in a commensurate fashion. Id. at 489-91, 112 S.Ct. 1430.
In this context, we examine the steps taken by CMS to eliminate the vestiges of segregation.
B.
1.
North Carolina’s most significant initial response to the mandate of Brown II was the “Pupil Assignment Act of 1955-56, under which [the Board had] the sole power to assign pupils to schools, and children [were] required to attend the schools to which they [were] assigned.” Swann v. Charlotte-Mecklenburg Bd. of Educ., 300 F.Supp. 1358, 1361 (W.D.N.C.1969). This was an ineffectual measure — perhaps intentionally so — and by 1964, no more than *373 a few dozen (out of more than 20,000) African-American children in CMS were attending schools with white children. Id. at 1362.
2.
In 1965, the parents of African-American children attending CMS (hereinafter the “Swann plaintiffs”)[1] filed a class action seeking injunctive relief, claiming that the Board’s policies and practices were perpetuating a segregated school system. Swann v. Charlotte-Mecklenburg Bd. of Educ., 243 F.Supp. 667, 668 (W.D.N.C.1965). On July 14, 1965, the district court approved a Board-proposed plan that closed certain black schools, built new schools, and established school attendance zones based on neighborhoods. But the linchpin of this plan was its grant of permission to each student — regardless of race — to freely transfer to a different school (often described as a “freedom of choice” plan). Id. In approving this plan, the district court held that CMS had no affirmative duty to “increase the mixing of the races”; instead, the Board’s obligation under Brown II, according to the court, was to act without the intent to perpetuate segregation. Id. at 670. The following year, this Court affirmed the district court’s interpretation of Brown II. See Swann v. Charlotte-Mecklenburg Bd. of Educ., 369 F.2d 29, 32 (4th Cir.1966) (“Whatever the Board may do in response to its own initiative or that of the community, we have held that there is no constitutional requirement that it act with the conscious purpose of achieving the maximum mixture of the races in the school population.”).
However, in the wake of the Supreme Court’s 1968 decision in Green, which struck down a desegregation plan founded predominantly on “freedom of choice,” it became clear that school boards did possess an affirmative obligation to desegregate, not merely an obligation to implement race-neutral policies. Green, 391 U.S. at 437-38, 88 S.Ct. 1689. Invigorated by the developing law, the Swann plaintiffs promptly filed a motion for further relief with the district court, seeking to expedite the desegregation process.
3.
In 1969, Judge James B. McMillan, newly assigned to the Swann case,[2] reexamined the Board’s actions in light of Green and determined that its “freedom of choice” plan, when coupled with geographic zoning, were “not furthering desegregation.” 300 F.Supp. at 1372. On the fundamental matters of assigning students and faculty, and the siting of new schools, the court made the following findings:
• Student assignment: The court noted that a ratio of seventy percent white students to thirty percent black students, which approximated the ratio of white to black students in the county, tended to aid “better students [in holding] their pace, with substantial improvement for the poorer students.” Id. at 1369.
• Faculty assignment: Although faculty members were not being assigned with a discriminatory purpose, there was also “no sustained effort to desegregate faculties.” Id. at 1370. The court ordered CMS to work actively to integrate the faculties, so that “a child attending any *374 school in the system will face about the same chances of having a black or a white teacher as he would in any other school.” Id.
• School siting: The court underscored that the desirability of implementing a “neighborhood school” policy, under which efforts were made to locate schools in neighborhoods and within walking distance for children, could not override the constitutional duty to desegregate. Id. at 1369. At the same time, CMS was not to avoid locating new facilities in black neighborhoods. Id. at 1371.
In light of Green, Judge McMillan also ordered CMS to submit a new, amended desegregation plan, and he outlined certain possible remedies, including busing and rezoning. Swann, 300 F.Supp. at 1360; Swann v. Charlotte-Mecklenburg Bd. of Educ., 306 F.Supp. 1299, 1302 (W.D.N.C.1969).
Once again, however, CMS was slow to respond, prompting Judge McMillan to impose a deadline of August 4, 1969, by which the Board was to submit a detailed desegregation plan to the court. See Swann v. Charlotte-Mecklenburg Bd. of Educ., 300 F.Supp. 1381, 1382, 1386 (W.D.N.C.1969). CMS complied, and its proposed desegregation plan appeared to accept, for the first time, the constitutional duty to desegregate students, teachers, principals, and staffs “ ‘at the earliest possible date.’ ” Swann v. Charlotte-Mecklenburg Bd. of Educ., 306 F.Supp. 1291, 1293 (W.D.N.C.1969). The Board’s proposed desegregation plan, approved by the district court on an interim basis (“interim desegregation plan”), included programs for faculty desegregation, the closing of seven all-black schools, and the reassignment of pupils from the closed schools to outlying, predominantly white schools. Id. at 1298-99. In approving the plan on an interim basis, the district court noted that black children were bearing a disproportionate burden of the desegregation efforts, but the court nonetheless concluded that some action — even if interim — was preferable to none at all. Id. at 1298. Judge McMillan also ordered the Board to submit another desegregation plan within three months.
In November and December 1969, the district court determined that the school system’s compliance with the interim desegregation plan was unsatisfactory, finding that the Board was continuing to perpetuate segregation:
The School Board is sharply divided in the expressed views of its members. From the testimony of its members, and from the latest report, it cannot be concluded that a majority of its members have accepted the court’s orders as representing the law which applies to the local schools. By the responses to the October 10 questions, the Board has indicated that its members do not accept the duty to desegregate the schools at any ascertainable time; and they have clearly indicated that they intend not to do it effective in the fall of 1970. They have also demonstrated a yawning gap between predictions and performance.
Swann, 306 F.Supp. at 1306. At that time, the district court also reviewed and rejected the Board’s newly submitted amended desegregation plan. Id. at 1313-14. Then, the court appointed Dr. John A. Finger, Jr. as an expert consultant to prepare a more acceptable plan. This appointment came nearly two years after the Supreme Court’s Green decision and more than fifteen years after Brown I.
The district court ultimately adopted Dr. Finger’s proposed plan for elementary schools and the Board’s plan, as modified by Dr. Finger, for secondary schools (col- *375 leetively the “Finger Plan”). Swann v. Charlotte-Mecklenburg Bd. of Educ., 311 F.Supp. 265, 268-70 (W.D.N.C.1970). In doing so, the court again observed the Board’s failure to make an effective beginning to desegregation: “The School Board, after four opportunities and nearly ten months of time, have failed to submit a lawful plan (one which desegregates all the schools). This default on their part leaves the court in the position of being forced to prepare or choose a lawful plan.” Id. at 267.
The Finger Plan included several components. First, students were to be assigned “in such a way that as nearly as practicable the various schools at various grade levels have about the same proportion of black and white students.” Id. at 268. Second, “no school [could] be operated with an all-black or predominantly black student body.” Id. Third, in redrawing the school system’s attendance zones, the Board was authorized to use bus transportation and noncontiguous “satellite zones”[3] to accomplish its goals. Id. Fourth, the district court restricted the student transfer policy in order to safeguard against resegregation. Id. at 268-69. Fifth, the race of faculty members at each school had to approximate the ratio of black and white faculty members throughout the system. Id. at 268. Sixth, the overall competence of teachers at formerly black schools could not be inferior to those at formerly white schools. Id. Finally, the district court mandated that the Board monitor and report on its progress in implementing the plan. Id. at 269.
The Finger Plan was challenged on several occasions and, in 1971, the Supreme Court upheld it as a valid exercise of the district court’s equitable powers. Swann, 402 U.S. at 31-32, 91 S.Ct. 1267. Indeed, the Court specifically found that the district court’s adoption of a student assignment plan that used race-based “mathematical ratios” as a starting point was well within the court’s “equitable remedial discretion.” Id. at 25, 91 S.Ct. 1267.
Even after the Supreme Court’s decision in Swann, the district court found that the Board’s desegregation efforts failed to meet constitutional requirements. For example, Judge McMillan ordered student assignment proposals revised in June 1971, finding that the proposals “were discriminatory in detail and in overall result; they placed increasing burdens upon black patrons while partially relieving white patrons of similar burdens.” Swann v. Charlotte-Mecklenburg Bd. of Educ., 328 F.Supp. 1346, 1347 (W.D.N.C.1971). During the 1971-72 and 1972-73 school years, the district court attempted a “hands-off’ approach, leaving the Board to remedy problems as they arose, but the court twice found that the Board still had not adopted sufficient measures to guard against resegregation and ensure that whites were bearing an appropriate share of the desegregation burden. See Swann v. Charlotte-Mecklenburg Bd. of Educ., 362 F.Supp. 1223, 1230 (W.D.N.C.1973); Swann v. Charlotte-Mecklenburg Bd. of Educ., 379 F.Supp. 1102 (W.D.N.C.1974); see also discussion of specific findings infra.
*376 The 1974 order expressed somewhat more optimism about the Board’s desegregation efforts. In that order, Judge McMillan approved a student assignment proposal that, if implemented properly, would result in “a fair and stable school operation” and would permit the court to close the case as an active matter. See 379 F.Supp. at 1103. The proposal made provisions for several “optional schools”-— schools that would offer some specialized program or curriculum and thereby attract students of all races from across Charlotte and Mecklenburg County. Although Judge McMillan approved the incorporation of these schools into the plan, he cautioned that the optional schools would be inconsistent with the school board’s constitutional obligations if they merely served to re-institute “freedom of choice.” Id. at 1104 (“ ‘Freedom of choice’ was a synonym for segregation for many years, and ... it should not be resurrected at this late date sub nom. ‘optional schools’ without adequate safeguards against discriminatory results.”). To ensure that the optional schools served their stated purpose of furthering the process of desegregation, Judge McMillan decreed that “optional school enrollments will be controlled starting with 1974 so that they ... have about or above 20% black students.” Id.
Finally, in July 1975, over twenty years after the mandate of Brown II, Judge McMillan for the first time observed, albeit with reservations, that the Board was actually working toward desegregation: “The new Board has taken a more positive attitude toward desegregation and has at last openly supported affirmative action to cope with recurrent racial problems in pupil assignment.” Swann v. Charlotte-Mecklenburg Bd. of Educ., 67 F.R.D. 648, 649 (W.D.N.C.1975). Although the district court cautioned that problems remained, the new vigor with which the Board was pursuing desegregation persuaded Judge McMillan to close Swann as an active matter of litigation and to remove it from the court’s docket. Id. at 649-50. In so acting, the court reaffirmed that its orders still stood: “[t]his case contains many orders of continuing effect, and could be re-opened upon proper showing that those orders are not being observed.” Id. at 649.
4.
Between 1975 and 1992, two significant actions were taken in connection with the CMS desegregation litigation.
a.
First, in 1978, a group of white parents and children brought suit against CMS, seeking an order prohibiting the Board from assigning children pursuant to the Board’s latest student-assignment plan. See Martin, 475 F.Supp. at 1320. The Martin plaintiffs claimed that the Supreme Court’s then-recent decisions in Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 436, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), and University of Cal. Regents v. Bakke, 438 U.S. 265, 305, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), prohibited any consideration of race in student assignment. 475 F.Supp. at 1321. The Swann plaintiffs intervened in Martin, joining the Board’s opposition to the contentions of the Martin plaintiffs. Id.
A brief review of Spangler and Bakke is necessary to an understanding of Martin. In Spangler, the Supreme Court held that because the Pasadena Unified School District (“PUSD”) had achieved racial neutrality in its school attendance pattern, “the District Court was not entitled to require the PUSD to rearrange its attendance zones each year so as to ensure that the racial mix desired by the court was maintained in perpetuity.” 427 U.S. at 436, 96 S.Ct. 2697. All parties in Spangler agreed *377 that the plan initially achieved racial neutrality in student attendance; nonetheless, the district court had believed it was empowered to annually readjust school boundaries to ensure in perpetuity that there would be no majority of any minority race at any Pasadena school. Id. at 433, 436, 96 S.Ct. 2697. In Bakke, the Supreme Court determined that a public university with no history of discrimination could not constitutionally reserve sixteen out of one hundred admission slots for racial minorities. 438 U.S. at 319-20, 98 S.Ct. 2733. In striking down this admissions plan, the Court had made clear that “[w]hen a classification denies an individual opportunities or benefits enjoyed by others solely because of his race or ethnic background, [it must] be regarded as [constitutionally] suspect.” Id. at 305, 98 S.Ct. 2733.
Judge McMillan, who retained jurisdiction over Swann and presided over Martin, first held that because CMS had not achieved racial neutrality in student attendance, consideration of race in student assignment policies was appropriate under Swann. See Martin v. Charlotte-Mecklenburg Bd. of Educ., 626 F.2d 1165 (4th Cir.1980). He explained that because the student assignment policy in the CMS school system had been independently adopted by the Board, it was not established, as the Spangler policy had been, via judicial coercion or order. 475 F.Supp. at 1340-43. Second, Judge McMillan ruled that Bakke was inapposite to the claims of the Martin plaintiffs. Specifically, the court reasoned that no child was being denied access to equal educational opportunity because of race, see id. at 1321, and the actions of the Board were therefore not constitutionally suspect under Bakke.
In upholding the independent actions of the Board, Judge McMillan made several important findings. For example, he found that discrimination had not ended; indeed, it was this very finding that led the court to uphold the 1978 race-conscious student assignment policy. Id. at 1346-47. Also, although for the first time the district court praised the efforts of the Board without reservation, it underscored yet again the need for patience and continued efforts:
It took three centuries to develop a slave culture, to fight a bloody civil war, and to live through the century of racial turmoil after that war.
The culture and attitudes and results of three centuries of segregation cannot be eliminated nor corrected in ten years. Human nature and practices don’t change that fast, even in the hands of people of good will like the members of the present School Board. They need time to work their own experiments, and to find their own ways of producing the sustained operation of a system of schools in which racial discrimination will play no part. I vote to uphold their efforts to date, and to give them that time.
Id. at 1347. In 1980, we affirmed the district court’s decision in Martin. See 626 F.2d at 1165.
b.
The second significant phase of litigation between 1975 and 1992 was initiated in 1980. At that time, CMS and the Swann plaintiffs notified the district court that the black student population in CMS elementary schools had grown from twenty-nine percent to forty percent, making it increasingly difficult to comply with the desegregation order’s mandate to avoid majority-black elementary schools. In response to this change, Judge McMillan approved a modification to the desegregation plan. Instead of prohibiting a “predominantly *378 black student body,” the court permitted CMS to operate elementary schools with a black student population of “plus 15 percent” above the district-wide average. Thus, if the school district averaged forty percent black students, any individual school could have fifty-five percent black students.
5.
From 1981 to 1992, the Board continued to operate its desegregation plan as approved by the district court, focusing, inter alia, on satellite attendance zones, a feeder plan (assigning middle-school students from a certain neighborhood to identified high schools), school closings, and construction of new schools. Then, in 1992, CMS substantially increased its reliance on “optional” or magnet schools (the “expanded magnet schools program”). The Board placed new emphasis on magnet schools in order to phase out “pairing” and heavy reliance on busing, and to give parents more choice in school selection. It was the expanded magnet schools program that ultimately led to the present phase of this litigation.
6.
In September 1997, William Capac-chione, individually and on behalf of his daughter Cristina, sued CMS claiming that Cristina was unconstitutionally denied admission to a magnet school. Christina is Hispanic and Caucasian, and her suit under 42 U.S.C. § 1983 sought declaratory, injunctive, and compensatory relief. In response, CMS moved to dismiss Capac-chione’s suit and, almost simultaneously, the Swann plaintiffs moved to reactivate Swann, claiming that CMS was not yet in compliance with past desegregation orders and had not yet achieved unitary status. Because Judge McMillan had died, the cases were assigned to Senior Judge Robert D. Potter, who restored Swann to the district court’s docket, consolidated" the cases, denied CMS’s motion to dismiss, and granted Capacchione’s motion to intervene.[4]
The Capacchione plaintiffs claimed that CMS had long since eliminated the vestiges of segregation in its schools, and that its formerly dual system of white and black schools had, for some time, been unitary. They also contended that CMS, while still operating under the court’s desegregation orders, had violated those orders and the constitutional rights of white students in its efforts to desegregate the school system by employing a race-conscious assignment lottery in its expanded magnet schools program. The Swann plaintiffs countered that the school system had not yet achieved unitary status. CMS acknowledged that it was not yet in compliance with past desegregation orders and agreed that it should not be declared to have achieved unitary status. CMS also contended that, in any event, the expanded magnet schools program constituted an entirely constitutional and appropriate integration tool authorized under the desegregation orders in this case. The Swann plaintiffs, while endorsing the concept of magnet schools, argued that the expanded magnet schools program, as implemented, *379 was contributing to the resegregation of the school system.
Following a bench trial conducted from April 19 to June 22, 1999, the court, on September 9, 1999, filed its Memorandum of Decision and Order, from which this appeal is taken. See Capacchione v. Charlotte-Mecklenburg Schs., 57 F.Supp.2d 228 (W.D.N.C.1999). Although the Board claimed that unitary status had not been achieved, the district court found that it had. In its ruling, the district court then found that the Board’s expanded magnet schools program, even though instituted to effect court-ordered desegregation, was unconstitutional. Furthermore, the court enjoined the Board from “assigning children to schools or allocating educational opportunities and benefits through race-based lotteries, preferences, set-asides, or other means that deny students an equal footing based on race.” Id. at 294. Finally, the court awarded the Capacchione plaintiffs nominal monetary damages and substantial attorney’s fees.
C.
The Board and Swann plaintiffs appealed every portion of the district court’s judgment. A panel of this Court, with one judge dissenting, vacated and remanded the district court’s unitary status determination, holding that the district court’s unitary status findings were insufficient with respect to student assignment, facilities, transportation, and student achievement. The panel also reversed the district court’s holding that the expanded magnet schools program violated the Equal Protection Clause, reasoning that the program complied in all respects with court orders governing the case and did not in any way violate the Constitution. Finally, the panel vacated the district court’s injunction, the award of nominal damages, and the award of attorney fees. See Belk v. Charlotte-Mecklenburg Bd. of Educ., 238 F.3d 232 (4th Cir.2000). Thereafter, on January 17, 2001, a majority of the active members of the Court voted to hear this case en banc.
II.
We first address the district court’s unitary status decision. The determination of whether any part of a school system has achieved unitary status is a factual one; therefore, the district court’s findings as to unitary status are reviewed for clear error. See Riddick v. School Bd. of the City of Norfolk, 784 F.2d 521, 533 (4th Cir.1986); see also Jacksonville Branch, NAACP v. Duval County Sch. Bd., 883 F.2d 945, 952 n. 3 (11th Cir.1989) (citing United States v. Texas Educ. Agency, 647 F.2d 504, 506 (5th Cir. Unit A 1981)). No deference, however, is owed to the district court on conclusions of law, including the district court’s understanding of controlling law or the various burdens of proof and presumptions; consequently, all such conclusions of law are reviewed de novo. See, e.g., In re Brice, 188 F.3d 576, 577 (4th Cir.1999).
A.
1.
Indisputably, the school system of Charlotte-Meeklenburg County subjected African-Americans to nearly a century of segregation and discrimination. Indeed, the Supreme Court recognized as much in Swann, noting that North Carolina was one of the states with “a long history of maintaining two sets of schools in a single school system deliberately operated to carry out a governmental policy to separate pupils in schools solely on the basis of race.” 402 U.S. at 5-6, 91 S.Ct. 1267. In this context the remedies forcefully endorsed in Brown II, including the use of race-conscious measures, are necessary to *380 eradicate the invidious segregation at which they are aimed.
Moreover, court supervision over local school boards, also embraced in Brown and its progeny, is entirely appropriate whenever “school authorities fail in their affirmative obligations” “to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated.” Swann, 402 U.S. at 15, 91 S.Ct. 1267. Not only are the federal courts entitled to supervise and direct the actions of local school boards under those circumstances, but the scope of federal authority is almost plenary: “Once a right and a violation have been shown, the scope of a district court’s equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.” Id. There is no doubt that CMS was justifiably subjected to federal court supervision; in fact, even after the Board had been subjected to court supervision, it had to be repeatedly ordered to begin the process of desegregation.
Ultimately, however, the goal in a desegregation case such as this is to reach the point at which federal supervision is no longer warranted and the use of race-conscious measures is no longer necessary. See Freeman, 503 U.S. at 489, 112 S.Ct. 1430. The Supreme Court has identified six factors (collectively the “original Green factors”) that must be free from racial discrimination before the mandate of Brown is met: (1) student assignment, (2) physical facilities, (3) transportation, (4) faculty, (5) staff, and (6) extracurricular activities. Green, 391 U.S. at 435, 88 S.Ct. 1689. Not only are reviewing courts to ascertain whether these original Green factors are free from racial discrimination, but courts also are entitled, in their discretion, to identify other factors (“ancillary factors”)[5] and “determine whether minority students were being disadvantaged in ways that required the formulation of new and further remedies to ensure full compliance with the court’s decree.” 503 U.S. at 492, 112 S.Ct. 1430.
2.
For school systems proceeding through the difficult process of desegregation, the Supreme Court has adopted the goal of achieving unitary status. Freeman, 503 U.S. at 486-87, 112 S.Ct. 1430; Board of Educ. of Okla. City v. Dowell, 498 U.S. 237, 245-46, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). Although prior to the Court’s Do-well and Freeman decisions federal courts used the term “unitary status” somewhat inconsistently, see Freeman, 503 U.S. at 486-87; Green, 391 U.S. at 437-38, 88 S.Ct. 1689, the term has now come to mean that the school system has been unified such that the vestiges of segregation have been eliminated to the extent practicable. Freeman, 503 U.S. at 487, 112 S.Ct. 1430; Green, 391 U.S. at 437-38, 88 S.Ct. 1689. When a school system achieves unitary status, federal courts must withdraw supervision over the local school board.
In this case, Judge Potter declared that CMS had achieved unitary status in every respect. The Supreme Court has directed that an appellate court review a district court’s unitary status determination by applying a two-part inquiry (the “Freeman inquiries”). An appellate court must determine if (1) a school Board has, in good faith, complied with the desegregation decree since it was entered; and (2) the *381 vestiges of de jure segregation in the school system have been eliminated to the extent practicable. See Freeman, 503 U.S. at 492, 112 S.Ct. 1430 (citing Dowell, 498 U.S. at 249-50, 111 S.Ct. 630).
If the party seeking a declaration of unitary status cannot demonstrate that the school system has achieved unitary status in its entirety, we then undertake to determine whether the school system has achieved unitary status with respect to one or some of the Green factors (“partial unitary status”). .At that point, we apply, with respect to each Green factor, the two Freeman inquiries along with one additional Freeman-mandated inquiry: “whether retention of judicial control [over one aspect of the school system] is necessary or practicable to achieve compliance with the decree in other facets of the school system.” Freeman, 503 U.S. at 491, 112 S.Ct. 1430. This third Freeman inquiry recognizes that the Green factors are — to a great extent — interrelated, and when determining whether judicial supervision over a school board may be withdrawn, the overlap between the Green factors is a crucial consideration.
The Freeman analysis brings us to the most difficult questions presented in any desegregation case: whether present racial isolation is a vestige of past segregation and, if so, whether a school board can practicably reduce that racial isolation. It is even difficult to define “vestige” in this context. See id. at 502 (Scalia, J., concurring) (“We have never sought to describe how one identifies ... a ‘vestige’ or a ‘remnant’ of past discrimination.... ”). The vestiges “that are the concern of the law may be subtle and intangible but nonetheless they must be so real that they have a causal link to the de jure violation being remedied.” Id. at 496, 112 S.Ct. 1430 (Kennedy, J.); see also id. at 512, 112 S.Ct. 1430 (Souter, J., concurring) (citing Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 465 & n. 13, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979) and Keyes v. School Dist. No. 1, Denver, 413 U.S. 189, 211 & n. 17, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973)) (court must order affirmative remedy where school board’s conduct “create[d] or contribute[d] to” racial identifiability of schools). We adhere to the most common-sense meaning of “vestige”: it is a condition or occurrence causally related to the former de jure system of segregation.
Because a school system’s duty to eliminate such vestiges is restricted by the availability of practicable measures for doing so, see Freeman, 503 U.S. at 492, 112 S.Ct. 1430, it is also incumbent on us to consider practicability. In determining the practicability of further measures, the district court must look to numerous indicia of the system’s operation. Practicability depends on the feasibility of the proposed method, from both a financial and an administrative perspective. Cf. id. at 481-83, 493-97, 112 S.Ct. 1430. Whether a measure is practicable also depends on whether it is “directed to curing the effects of the specific violation,” and whether it is likely to do so. Id. at 497, 112 S.Ct. 1430.
Our duty, in reviewing Judge Potter’s decision, see Capacchione, 57 F.Supp.2d at 228, is clear. We must examine each Green factor and ascertain whether unitary status has been achieved with respect to any or all of them. Because the district court declared the entire CMS school system to have achieved unitary status, we must assess, with respect to each Green factor, whether the Board has complied, in good faith, with the desegregation decree and whether the vestiges of segregation have been eliminated to the extent practicable. See Freeman, 503 U.S. at 492, 112 S.Ct. 1430 (citing Dowell, 498 U.S. at 249-50, 111 S.Ct. 630). If the school system has not achieved unitary status in its en *382 tirety, then, consistent with Freeman, we also must weigh the degree of interrelatedness existing between the various Green factors.
B.
By way of introduction to our analysis of this case, we first address a fundamental flaw in the district court’s proceedings — -a flaw arising from the district court’s failure to give any consideration to a remedial plan sought to be admitted as evidence by CMS. Following the filing of the Capac-chione plaintiffs’ Complaint in Intervention, the Board undertook to produce a comprehensive analysis of whether vestiges of de jure segregation existed in CMS and whether any such vestiges could be practicably remedied. The Board analyzed available data and identified several vestiges remaining; then, in line with the mandate of Freeman, the Superintendent of CMS developed a plan containing practicable remedial steps. The Board independently reviewed this plan and, on March 30, 1999, adopted the “Charlotte-Mecklen-burg Schools’ Remedial Plan to Address the Remaining Vestiges of Segregation” (the “Plan” or “Remedial Plan”). J.A. 11029.
Consistent with pretrial deadlines, CMS filed the Remedial Plan with the district court as a potential exhibit at trial. J.A. 11028. At the pretrial conference conducted on April 13, 1999, the Capacchione plaintiffs moved in limine to exclude the Remedial Plan. In essence, the Capac-chione plaintiffs maintained that the trial had been bifurcated into two phases and that only unitary status was at issue in the first phase. They further maintained that the Remedial Plan contained proposed remedies that could only be implemented if CMS was determined not to have achieved unitary status. Because the unitary status question had not yet been resolved, they claimed that the Remedial Plan (which the Capacchione plaintiffs characterized as a damages report) was irrelevant.
In opposing exclusion of the Remedial Plan, CMS and the Swann plaintiffs relied on the Supreme Court’s Freeman analysis. J.A. 1421. Specifically, they asserted that each unitary status determination encompassed in the first phase of the trial turned on “whether the vestiges have been remedied to the extent practicable.” Id. (emphasis added). The Remedial Plan, they claimed, was not merely relevant, but crucial, to establishing both the existence of vestiges of segregation and the practicability of remedial measures.
Judge Potter responded with two rulings. First, Judge Potter explained in assessing whether CMS had achieved unitary status that he believed Freeman required him to consider just one thing: “only ... what CMS has done, not what it may do in the future.” See Order of April 14, 1999 at 4. Second, based on this understanding of Freeman and the unitary status test, Judge Potter concluded that the Remedial Plan was irrelevant: “If the Court later determines that additional remedial measures are needed, it may consider the plan. Until that time comes, however, the Court will not get mired in the complex details and mechanics of a proposed plan.” Id. at 5.[6]
*383 We believe Judge Potter erred in both of these rulings. First, he misapprehended Freeman and its test for unitary status. At the outset, Freeman explicitly rejects, as a matter of law, the very analysis adopted by the district court. That is, under Freeman, a district court must consider (1) compliance with prior orders (ie., “what CMS has done”), and (2) whether vestiges have been eliminated to the extent practicable (ie., “what [CMS] may do in the future”). See Freeman, 503 U.S. at 491, 112 S.Ct. 1430; see also Order of April 14, 1999 at 4. By construing Freeman’s unitary status test to include the former (“what CMS has done”) but not the latter (“what [CMS] may do in the future”), Judge Potter erred as a matter of law.
The Remedial Plan directly addresses the latter inquiry, and it does so in an apt, informed manner, relying on the considered opinions of highly capable professionals retained to analyze the latest available data. In other words, the district court’s second reason for excluding the Plan- — relevancy—also fails to withstand scrutiny.[7] There is no doubt that Judge Potter had wide discretion on this issue, but relevancy is a fluid concept under the Federal Rules of Evidence. See Fed.R.Evid. 401 (defining relevant evidence as “having any tendency to make the existence” of any material fact “more probable or less probable than it would be without the evidence”). Consequently, relevancy typically presents a rather low barrier to admissibility. See, e.g., United States v. Van Metre, 150 F.3d 339, 349 (4th Cir.1998) (citing United States v. Powers, 59 F.3d 1460, 1465 (4th Cir.1995)).
However, we need not rely on the minimal threshold encompassed in the test for relevancy because this Remedial Plan would be relevant under any reasonable test. The Remedial Plan identified record evidence (including the deposition testimony of several experts) supporting the Board’s belief that vestiges of de jure segregation in CMS remain apparent in (1) faculty assignment and quality, (2) physical facilities and the allocation of instructional resources, (3) student achievement, and (4) student assignment. More importantly, the Remedial Plan detailed specific steps that the Board proposed to undertake over the course of the ensuing five years “with a goal of achieving unitary status at that time.” J.A. 11029.
Without a doubt, federal courts possess the final word in deciding whether a particular school system is operating within *384 the parameters of the Constitution. Appreciable weight must be given, however, to the views of those selected by the community to administer the system. See Do-well, 498 U.S. at 248, 111 S.Ct. 630 (noting specialized knowledge possessed by local school officials).[8] In refusing to consider the Plan, the district court erroneously failed to accord the Board’s official position any weight, much less the respect that it was due.
That the district court so completely disregarded this crucial evidence is telling. Nonetheless, ever mindful of the deference accorded the factfinder, we embark upon the task of examining the court’s conclusions.

1. Student assignment

Of all the Green factors, the most prominent is the degree of racial imbalance in student assignment. Freeman, 503 U.S. at 474, 112 S.Ct. 1430. Uniformity in the racial composition of a given school was the hallmark of official discrimination, “for under the former de jure regimes racial exclusion was both the means and the end of a policy motivated by disparagement of, or hostility towards, the disfavored race.” Id. Court-ordered desegregation was designed to meet the enemy head-on; the long-term stability of attempts at racial balancing in student assignment is often seen as the most conspicuous indication of the courts’ success (or lack thereof) in combating the underlying societal evil.
The fundamental questions before us are whether present racial isolation in CMS may be a vestige of the former dual system, and, if so, whether there are practicable measures CMS could take to reduce or eliminate that isolation. In considering these questions, we are bound to focus particularly on the Board’s record of compliance with the district court’s desegregation orders. See id. at 492, 112 S.Ct. 1430 (citing Dowell). Because significant and growing racial imbalances in student assignment do exist in CMS, because the Board for decades has failed to comply with certain specific decrees of the district court (particularly regarding the siting of new schools), because these failures may have contributed to current racial isolation, and because future compliance might practicably reduce this racial isolation, we would vacate the district court’s finding that CMS has achieved unitary status with respect to student assignment.
a.
In the wake of the 1970 desegregation order, virtually all of the schools in CMS operated in racial balance for a considerable time. By 1998-99 however, nearly thirty percent of the schools in the system had become racially identifiable.[9] Of the 126 schools included in the CMS desegregation plan, twenty-three are identifiably black and thirteen more are identifiably white. J.A. 11587. Further, virtually all *385 of the identifiably black schools are located in either the inner city or in the immediate northwest-to-northeast suburbs, the areas of Mecklenburg County with the highest concentration of African-Americans. In stark contrast, all thirteen of the identifiably white schools are found in the extreme northern and southern areas of the county, both of which (and particularly the latter) have seen dramatic increases in white population during the past thirty years. The trend in CMS toward resegre-gation of its schools has accelerated markedly since the move to deemphasize satellite zones and mandatory busing in 1992. In the last seven years, the number of CMS African-American students who attend racially identifiable schools (now almost three in ten) has risen fifty percent. J.A. 9589.
Indisputably, from 1981 until 1997, the CMS school system went through significant demographic changes. For example, the total population of Mecklenburg County has grown from 354,656 in 1970 to 613, 310 in 1997. J.A. 16247. Almost 100,000 children attend CMS, making it the twenty-third largest school system in the country. J.A. 7107. During the period from 1970 to 1997, the black school-age population (ages 5 through 17) in the county has increased by approximately .10,000. J.A. 16247. Over the same period, the corresponding white school-age population has decreased by approximately 3,000, id., and by 1997, African-Americans comprised 34 percent of the county’s school-age population, the total of which numbered approximately 108,600. Evidence before the district court revealed that, since 1970, the growing African-American population has migrated outward from the inner city into formerly white suburbs. In turn, many white citizens who formerly populated the city’s periphery have moved even farther into the county’s outlying reaches. Though parts of the county have become more integrated as the result of these shifts, a disproportionately large number of African-Americans still reside in contiguous clusters generally north and west of the down-town area.
The threshold issue to be addressed is whether the thirty-six racially identifiable schools in CMS represent a vestige of segregation — that is, whether the present racial isolation is causally related to the prior system of de jure segregation. The Swann plaintiffs argue, and CMS agrees, that current racial isolation, like the racial isolation of the 1960s and 1970s, results both from past inequities that, to some extent, have persisted to this day, and from the Board’s failure to comply with certain specific directives in the remedial decrees in this case.
Because CMS has not previously been adjudged to have achieved unitary status in student assignment, we are bound under Swann to presume that the current racial imbalance in the school population constitutes a continuing vestige of segregation. 402 U.S. at 26, 91 S.Ct. 1267. The Capac-chione plaintiffs have the burden of showing that the present existence of predominantly one-race schools in CMS “is not the result of present or past discriminatory action.” Id.; see also Riddick, 784 F.2d at 535.
Our unwillingness to conclude that CMS is unitary with respect to student assignment centers on the Board’s failure to comply with court orders regarding selection of sites for the construction of new schools. The role of school siting in achieving sustainable desegregation should not be underestimated. In fact, the importance of site selection has been apparent since the early stages of this case. As the Supreme Court explained in 1971:
In the past [site selection] choices ... have been used as a potent weapon for *386 creating or maintaining a state-segregated school system.... [S]chool authorities have sometimes, since Brown, closed schools which appeared likely to become racially mixed through changes in neighborhood residential patterns. This was sometimes accompanied by building new schools in the areas of white suburban expansion farthest from Negro population centers in order to maintain the separation of the races with a minimum departure from the formal principles of “neighborhood zoning.” Such a policy does more than simply influence the short-run composition of the student body of a new school. It may well promote segregated residential patterns which, when combined with “neighborhood zoning,” further lock the school system into the mold of separation of the races.... In ascertaining the existence of legally imposed school segregation, the existence of a pattern of school construction and abandonment is thus a factor of great weight.
Swann, 402 U.S. at 21, 91 S.Ct. 1267.
Subsequent to the Supreme Court’s decision in Swann, Judge McMillan specifically ordered that site selection for new schools could not “be predicated on population trends alone.” 379 F.Supp. at 1107. New schools were “to be built where they can readily serve both races.” Id. In the 1979 Martin decision,[10] Judge McMillan devoted an entire section of his opinion to demonstrating that “construction, location and closing of school buildings continue to promote segregation.” 475 F.Supp. at 1329. Judge McMillan explained that “[t]he location of schools plays a large if not determinative role in ... insuring that any given assignment and feeder plan will provide meaningful desegregation, rather than just the predictably short lived appearance of desegregation.” Id. at 1332.
In the years since this decree was issued, CMS has built twenty-five of twenty-seven new schools in predominantly white suburban communities. In the mid 1980s, CMS adopted a formal policy of building “midpoint” schools — schools located midway between black and white population centers. There is little evidence, however, to suggest that CMS faithfully adhered to this policy. Rather, record evidence strongly indicates that the policy influenced the site selection for, at most, four of the twenty-seven new schools. See J.A. 15404-06. Meanwhile, as we discuss infra, there is substantial evidence that CMS has allowed many of its older school facilities in the city — schools attended in disproportionate numbers by African-American students — to fall into a state of disrepair.
The Board’s record of building the great majority of its new schools on the predominantly white suburban fringe of the county supports two possible conclusions. On one hand, CMS could have been responding to demographic reality — a demand for new classrooms in areas of high population growth (although we note that the number of white students in CMS has decreased since 1970, while the black student population has greatly increased). On the other hand, the Board’s pattern of school construction could have facilitated or even hastened white flight to the suburbs. As the Supreme Court explained in Swann, *387 “[p]eople gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods.” 402 U.S. at 20-21, 91 S.Ct. 1267. The Board’s school siting policies could well evidence its lack of political will in the face of pressure to abandon desegregative policies — pressure from families who “are concerned about the racial composition of a prospective school and [who] will make residential decisions accordingly.” Freeman, 503 U.S. at 513, 112 S.Ct. 1430 (Blackmun, J., concurring).
There is certainly no evidence that CMS has intentionally sought, through its school siting policies, to “lock the school system into the mold of separation of the races” in the way that the Supreme Court described in Swann, 402 U.S. at 21, 91 S.Ct. 1267. But the actual choices the Board has made with regard to school siting may in fact be quite similar to the “pattern of school construction and abandonment” described by the Court, with the actual effect that the Court feared of “lock[ingj the school system” into a condition of racial isolation. 402 U.S. at 21, 91 S.Ct. 1267. We cannot conclude, at least in the absence of further fact-finding, that CMS, in choosing sites for new schools, has pursued “meaningful desegregation, rather than just the predictably short lived appearance of desegregation.” 475 F.Supp. at 1332.
Rather, the Board’s practice of siting new schools such that they could not reasonably be expected to serve a racially balanced student population and Judge McMillan’s determination that this practice, in the past, represented the school system’s failure to eliminate the vestiges of segregation, together raise a strong inference that those vestiges remain today. When this inference is viewed in combination with the burden borne by the Capac-chione plaintiffs to show that current racial imbalances have no causal link to past discrimination, we are compelled to conclude that a remand to the district court is required.
Although we defer to a district court’s findings of fact unless clearly erroneous, Judge Potter’s error here came in his application of the legal standard to the evidence regarding the Board’s school siting policies. Judge Potter found that (1) CMS had not discriminated on the basis of race in choosing sites for new schools and that (2) CMS had incorporated racial diversity as one of its factors in site selection. Even assuming arguendo that both findings are not clearly erroneous, neither is sufficient to support the legal conclusion that in siting new schools CMS acted in compliance with the governing court orders and Constitution to eliminate the vestiges of segregation to the extent practicable.
“To fulfill this duty, school officials are obligated not only to avoid any official action that has the effect of perpetuating or reestablishing a dual school system, but also to render decisions that further desegregation and help to eliminate the effects of the previous dual school system.” Harris v. Crenshaw County Bd. of Educ., 968 F.2d 1090, 1095 (11th Cir.1992) (citing Pitts v. Freeman, 755 F.2d 1423, 1427 (11th Cir.1985)). Therefore, CMS had to do more than merely select sites for new schools on a nondiseriminatory basis. It had to do more, too, than simply give some consideration to “diversity” in its selection of sites. To the extent practicable, CMS had to site new schools “where they can readily serve both races.” 379 F.Supp. at 1107; see also Swann, 402 U.S. at 21, 91 S.Ct. 1267; Martin, 475 F.Supp. at 1329-32. Judge Potter never found that CMS had met this standard, and as outlined *388 within, there is substantial record evidence that CMS did not do so.
In accordance with Swann, the burden is on the Capacchione plaintiffs to prove that vestiges of past discrimination do not remain, or that nothing can practicably be done to remedy them. We note that Judge McMillan, in his last published decision in this case, clearly evidenced his understanding both that CMS had not done all that it could do in the area of school siting and that future school siting decisions could practicably advance the process of desegregation. It was thus incumbent on the Capacchione plaintiffs to demonstrate that conditions in Charlotte and Mecklenburg County have changed sufficiently such that school siting no longer represents a practicable opportunity to eliminate the vestiges of segregation.
The Swann plaintiffs have identified additional areas in which CMS has fallen short of its obligations under the court orders. For the life of the desegregation orders, CMS has consistently placed the heaviest burden of mandatory busing on African-American students. Currently, 80% of those students who ride the bus as a result of a mandatory assignment are African-American. J.A. 11515. Judge McMillan repeatedly ordered CMS to distribute this burden more fairly. See 475 F.Supp. at 1339-40, 379 F.Supp. at 1103-04, 362 F.Supp. at 1232-33. Yet, CMS has utterly failed to do so. In addition, CMS has never developed an effective system for monitoring student transfers to ensure that the overall effect of such transfers is not to increase the racial imbalance in the system as a whole. Again, this represents a failure to comply with the explicit instructions of the district court. See 475 F.Supp. at 1337-38, 379 F.Supp. at 1103-04, 362 F.Supp. at 1229-30. We are troubled by these failings on the part of CMS. They provide additional support for a conclusion that, in the face of political pressure, CMS has not done all that it could do to eliminate the vestiges of segregation.
Finally, the Board has itself taken the remarkable step of admitting its noncompliance with prior orders in this case. A school board’s frank acquiescence in a position inuring to its detriment (in this case, the potential of ongoing judicial intervention), if not treated as conclusive, should at least be considered with the utmost gravity. Under these circumstances, we have no difficulty in determining that the district court’s conclusion that the Board’s level of compliance was “full and satisfactory” should be vacated.
b.
If the vestiges of official discrimination have indeed been eliminated to the extent practicable with respect to student assignment, then there is little reason to prolong court supervision. In light of the district court’s failure, however, to recognize the Board’s continuing noncompliance with respect to student assignment — administered as recently as twenty years ago in a manner reinforcing the once-official notion that African-Americans are inferior — we have no confidence in the court’s ultimate finding that these vestiges have now disappeared.
The district court neglected to determine whether, since Judge McMillan’s decision in Martin, CMS has fulfilled its constitutional and court-imposed obligations with regard to site selection for new schools. Had the Board’s efforts been deemed lacking, the court below should have proceeded to decide whether this failure contributed to the present condition of racial isolation in the school system. If the district court then found that CMS had failed to live up to its constitutional and judicially decreed obligations, and if that failure did contribute to the *389 present racial imbalances, then the court was bound to further investigate whether proper site selection is a practicable, remedy for the lingering effects of the Board’s past discriminatory practices. Only if proper site selection were not a viable option could the district court have relinquished control over student assignment; there would be nothing further that CMS could practicably do to eliminate the vestiges of the prior de jure system.
If, however, proper sites were found to be available, then student assignment should have remained under the district court’s control. In fashioning a remedy, the court might have directed, for example, that most or all new schools constructed over the next several years be located proximate to the inner city or in midpoint areas already integrated residentially. Conversely, the district court might have concluded that more flexibility is required because of real estate costs, crushing demand in the suburban fringes, or for some other sufficient reason. In this vein, the Board’s Remedial Plan could have been considered as a limited term remedy for the racial isolation that would otherwise continue to exist until the Board’s newly redirected school siting policies can begin to take effect.[11]
Should corrective action one day be deemed justified in this case, some reasons will not be sufficient to deny African-American students a remedy. For example, political pressure and perceived resistance to change by certain groups in the community will not suffice. Additionally, logistical barriers merely making “difficult” the transport inward of outlying white students will likewise, if reasonably surmountable, not be enough. Cf. Capacchione, 57 F.Supp.2d at 253 (district court’s observation that “transport[ing] white students in from satellite zones ... is difficult given the rush hour traffic patterns”). Although what is “practicable” need not extend to all that is “possible,” rectifying the grievous constitutional wrongs of the past surely justifies reaching beyond the “difficult” or purely “problematic.”

2. Physical Facilities.

After describing how CMS has allocated its physical facilities and resources among its students, Judge Potter concluded that “the Swann plaintiffs have failed to overcome the Court’s previous findings on facilities by establishing the requisite discriminatory intent and causation.” Id. at 267. Judge Potter’s mention of “previous findings” refers to excerpts from various opinions and orders authored by Judge McMillan:
April 1969 — “No racial discrimination or inequality is found in the .... quality of the school buildings and equipment.... Schools described by witnesses as ‘white’ ranged well up and down on both sides of [the average per-pupil expenditure], and schools described by wit *390 nesses as ‘black’ showed a similar variation.” 300 F.Supp. at 1366.
August 1969 — -“The defendants contended and the court found in its April 23, 1969 order that facilities and teachers in the various black schools were not measurably inferior to those in the various white schools. It is too late now to expect the court to proceed upon an opposite assumption.” 306 F.Supp. at 1298.
October 1971 — “[T]he formerly black schools are not shown nor suggested to be inferior in faculty, plant, equipment or program.” 334 F.Supp. at 625.
Toward the close of the prior proceedings in 1975 (and consistent with the above), Judge McMillan awarded attorney’s fees to the Swann plaintiffs as prevailing parties, “[e]xcept for the refusal of the court to find in the plaintiffs’ favor ... regarding adequacy of physical plants and equipment and teacher quality.” Swann, 66 F.R.D. at 484.
Judge Potter acknowledged that no court “ha[d] [ lever granted unitary status to CMS, nor ... partially withdrawn supervision as to facilities or any other Green factor.” Capacchione, 57 F.Supp.2d at 262. The court nevertheless relied on the above 1969 and 1971 findings to release the Capacchione plaintiffs from their burden of proving CMS unitary with respect to facilities, stating that to proceed otherwise would “defy logic.” Id. at 263. Judge Potter thus accepted the premise that Judge McMillan’s 1969 and 1971 findings “constitute collateral estoppel and law of the case” regarding facilities, “thereby shifting the burden to CMS and the Swann plaintiffs to show discriminatory intent.” Id. at 262.
The district court’s burden-shifting analysis was an error of law. Once the existence of an unlawful dual school system has been established and court supervision begun, it is presumed that racial disparities arising during the period of intervention “are causally related to prior segregation.” School Bd. of the City of Richmond v. Baliles, 829 F.2d 1308, 1311 (4th Cir.1987). Following the imposition of judicial control, a party seeking to end the status quo bears the burden of overcoming the presumption of causation. If this burden is met and the school system is declared to have achieved unitary status as to the particular factor at issue, the presumption ends. Id. Generally, in any subsequent proceeding involving new allegations of disparate treatment, the complaining party must show purposeful discrimination. Riddick, 784 F.2d at 537 (concluding that Swann and its progeny require proof of “discriminatory intent on the part of the school board of a unitary school system” in order to resume court supervision).[12]
To be sure, the absence heretofore of any finding to the contrary would have been an important consideration in determining whether the Capacchione plaintiffs had proved CMS to have achieved unitary status with respect to facilities. However, that Judge McMillan did not intend his initial observations regarding facilities to be construed as a finding of unitary status is obvious from his subsequent actions. In 1973, Judge McMillan assumed control over facilities and resources, found inequities, and ordered CMS to remedy those disparities. See Swann, 362 F.Supp. at 1235 (finding Double Oaks Elementary access road still undeveloped two years after court’s identification of the problem — “No *391 $80,000,000 budget is so powerless.”); id. (finding Double Oaks library not restored to standards several years after fire); id. at 1238 (ordering athletic facilities at West Charlotte High School immediately upgraded to level comparable with other schools in the county). We must conclude that the Board has been subject to the court’s jurisdiction as to its facilities since at least 1973. See Dowell, 498 U.S. at 246, 111 S.Ct. 630 (school boards entitled to a “rather precise statement” terminating a desegregation order).
The asserted lack of a prior adverse finding should not have been determinative of the issue, especially as the district court in 1969 was not focusing on a school system suddenly thrust into the judicial arena, but was instead examining one that had been subject to court supervision for nearly four years. Between the commencement of the initial Swann lawsuit in 1965 and the district court’s first mention of the facilities issue in April 1969, CMS closed sixteen black schools. The Board’s en masse action gives rise to an almost undeniable inference that these schools were shut down because they were inferi- or, and the timing also suggests strongly that the closures were prompted by the judicial proceedings then underway.
Viewed in context, the most plausible conclusion is that the putative equality mentioned by the district court in 1969 and 1971 was actually an endorsement of the steps that had been taken by the Board to remedy the inequities in facilities. In any event, CMS could not be said to have achieved unitary status absent a finding by the lower court that the Board had “eliminated the vestiges of its prior discrimination,” embodied in an “adjudication] ... through the proper judicial procedures.” Georgia State Conference of Branches of NAACP v. Georgia, 775 F.2d 1403, 1413 n. 12 (11th Cir.1985), quoted in Dowell, 498 U.S. at 245, 111 S.Ct. 630 (noting distinction between school systems operating in an unitary fashion and those that have achieved unitary status, and observing that the former “could be called unitary and nevertheless still contain vestiges of past discrimination”).
Thirty-five years have passed since the Board first acted to equalize its facilities, yet serious questions remain as to whether it has finally realized that goal. Dr. Dwayne E. Gardner, an impressively qualified educational planner and consultant, compiled an exhaustive report for the Board in which he evaluated the suitability of its school facilities.[13] Dr. Gardner examined and personally visited more than half of the schools in CMS (including all of the high schools), analyzing a host of factors affecting educational quality. For the purposes of his study, Dr. Gardner divided the subject schools into three groups: (1) all imbalanced-black schools; (2) all racially balanced schools in imbalanced-black census tracts; and (3) each remaining high school, along with a set of elementary and middle schools randomly selected from the remaining schools and approximately equal in number to those already included within the first two groups.
Each school in the study was assigned a composite score from 0-100, indicating its worthiness. Schools scoring 44 or lower were, in Dr. Gardner’s opinion, so deficient as to merit replacement, while those with scores between 45-59 were classified as needing “major improvements.” Any school that scored 60 or above was “consid *392 ered to have the ability to serve the educational program adequately.” J.A. 12174.
The results of Dr. Gardner’s study are troubling. The average score for the forty Group 3 schools (racially balanced or imbalanced-white in predominantly white or balanced areas) was 61.7. Although the Group 3 data indicate a situation that is far from ideal, the ten Group 2 schools (racially balanced in predominantly black areas) fared much worse, with an average score of 56.3. The scores of the twenty-three Group 1 schools (imbalanced-black) were worse still, averaging just 53.3.[14] At trial, Dr. Gardner confirmed that the disparities apparent from the above numbers were “substantial” with respect to the facilities generally available to white and African-American children attending CMS. J.A. 6196-99.
The anecdotal accounts of a number of witnesses effectively corroborated Dr. Gardner’s conclusions. See, e.g., J.A. 4992 (testimony of Board member Pamela R. Mange) (schools with “more severe” problems tended to be predominantly black); J.A. 4769 (testimony of Annelle Houk) (“[T]he schools that were in the worst repair and had the poorest supply of resources ... were on the west side and they were predominantly populated by black students.”). John A. Kramer, co-chair of an advisory task force created by the Board, made formal visits to several CMS schools in 1997. Among the locales on Mr. Kramer’s itinerary were Elizabeth Lane Elementary, a predominantly white school located in a prosperous suburban area of the county, and Shamrock Gardens Elementary, a downtown school with an African-American student population exceeding sixty percent. Mr. Kramer’s descriptions of his visits contrasted sharply:
[T]o compare Elizabeth Lane Elementary as an example, which is a relatively new school located in Matthews, I walked into that school, I was overwhelmed because I had never set foot in a school that was like that before. It was clean, it was light and airy, it was a beautiful facility.... My overwhelming feeling was, wow, I wish my kids could *393 go to this school. And another observation that was very clear was that when I looked at the student body, it was virtually all white students, obviously, affluent, happy kids having a great time.
On the other hand, my experience, for example, at Shamrock Gardens was shocking by comparison. I had never visited either one of these schools before, but to visit that school which is in the inner city, the students are predominantly black students, it reminded me of a rundown 1950s motel. There was literally no access to the rooms except by outer walkways that were covered by rusted, dilapidated overhead fixtures .... They were using closets and things to teach children in. The carpets were stained and threadbare.... It just didn’t feel clean, it didn’t feel good. And I can honestly say that as a parent, my heartfelt reaction was relief that my children didn’t have to go to school there.
J.A. 6098-99. Even those Board members who voted to pursue a determination of unitary status before the district court admitted that disparity in facilities was a problem within CMS. J.A. 1817, 1820 (testimony of James H. Puckett); J.A.1918-19 (testimony of John W. Lassiter); J.A. 2095-96 (testimony of Lindalyn Kakadelis).
Although it seems reasonably clear that a racial disparity in facilities exists in CMS, its cause is somewhat less apparent. The Capacchione plaintiffs maintain that no discrepancies exist in CMS facilities, and even if they do, such discrepancies are totally benign in origin. Had the Capac-chione plaintiffs proved their theory, we would be constrained to affirm the district court’s conclusion that unitary status has been achieved with respect to the facilities factor. The district court, however, required the Capacchione plaintiffs to prove nothing; it instead erroneously placed the burden on CMS and the Swann plaintiffs to affirmatively show that the present inequities in facilities are a vestige of official discrimination, ie., causally related to the prior de jure system of segregation. Capacchione, 57 F.Supp.2d at 267.
The district court erred as a matter of law in foreclosing the development of evidence relevant to a proper vestige analysis. We would therefore remand this portion of the case to permit the parties and the district court to elicit the additional facts necessary to fully consider the question of causation with respect to the current racial inequities in facilities. Because CMS has not been previously adjudged to have attained unitary status, we would charge the Capacchione plaintiffs on remand with the burden of demonstrating that the vestiges of past de jure racial discrimination in the context of the school system’s facilities have been eliminated “root and branch” to the extent practicable.[15]

*394
S. Transportation

School bus transportation was at the epicenter of the original Swann litigation, specifically the degree to which involuntary busing could be used to implement a remedial desegregation decree. The Supreme Court in Swann, of course, approved busing as a “normal and accepted tool of educational policy,” 402 U.S. at 29, 91 S.Ct. 1267, at least to the extent that the rigors of time and distance would pose little risk to the affected students’ health or to the educational process as a whole. See id. at 30-31, 91 S.Ct. 1267. In the intervening twenty-nine years, CMS has taken the Court’s license to heart; during the 1998-99 school year, five of every six students in the school system rode a school bus.
Upon review of the Green factor of transportation, Judge Potter concluded that “a court may grant unitary status when transportation is provided on a nondiscriminatory basis.” 57 F.Supp.2d at 267. In other words, according to the district court, a school system achieves unitary status with respect to transportation once it provides access to transportation non-discriminatorily to black and white children. Because CMS provides all children, regardless of race, access to transportation, Judge Potter concluded that CMS had achieved unitary status with respect to this Green factor.
We must be mindful of the Supreme Court’s command to consider the interrelatedness of the various Green factors. See Freeman, 503 U.S. at 491, 112 S.Ct. 1430 (court must consider “whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system”). In this context, we can only conclude that the Green factor of transportation is so inextricably intertwined with the Green factors of student assignment and facilities that vacatur on these latter issues would also mandate vacatur on the former.[16]
The Swann plaintiffs maintain and offer substantial record evidence that the burdens of busing for desegregation purposes are being borne disproportionately and unfairly by African-American children. Brief of Appellants at 31-32, 33-35; see Swann, 306 F.Supp. at 1298 (district court commenting in initial stages of remediation that it did not intend “to endorse or *395 approve any future plan which puts the burden of desegregation primarily upon one race”). Eighty percent of students who currently ride the bus as a result of a mandatory assignment are African-American. Judge Potter rejected any consideration of this evidence, holding that a school district has achieved unitary status with respect to transportation as soon as it is provided on a race-neutral basis. The evidence, however, demonstrates the close interrelationship of transportation with student assignment. In view of our conclusion that CMS is not yet unitary with regard to student assignment, we think it is premature to relinquish control over transportation at this stage.[17]
A Faculty
Our analysis of this factor must take two concerns into account. We must determine both whether CMS has generally eliminated the vestiges of discrimination in faculty assignment, and whether the teachers assigned to predominantly black schools are of comparable quality to those teaching in schools with large numbers of white students.[18] See Swann, 311 F.Supp. at 268 (final desegregation order directing that the racial composition of faculty assigned to each school reflect that of the system at large, with the proviso that “the competence and experience of teachers in formerly or recently black schools will not be inferior to those in the formerly or recently white schools in the system”).
The evidence at trial demonstrated that CMS assigned its faculty in substantial compliance with the desegregation order at least until 1992, when school principals were granted the leeway to actively recruit new teachers without the strictures of maintaining a specific racial proportion. As a result of this gravitation from centralized to site-based control of faculty assignments, a trend away from proportionality has emerged. In 1998-99, one-third of the 126 schools covered by the remedial decree had a proportion of black faculty deviating more than ten percent from the system-wide norm (about twenty-one percent). Prior to the 1992 change in policy, no more than one-sixth of the schools had ever been so situated.
We are satisfied that the current trend toward faculty imbalance is neither a vestige of the dual system nor the product of subsequent discrimination. There is no evidence that this trend results from legal or administrative compulsion within CMS or from perceptions about the desirability or undesirability of teaching positions in schools that serve students of predominantly one race. In short, we do not perceive a causal relationship between past de jure segregation and the present assign *396 ment of faculty members to schools within CMS.[19]
Nor do we think that this trend toward more racially imbalanced faculties has resulted in disparities in the quality of teaching, as measured by the instructors’ years of experience and post-graduate work. Indeed, there is no significant difference in experience between faculties at imbalanced-black schools as compared to those that are imbalanced-white. Faculties at black schools are about one year less experienced than the district-wide average, while faculties at white schools are correspondingly more seasoned. This disparity may arouse some initial concerns, until one is informed that the typical CMS teacher has spent more than ten years in the classroom. The upshot is that black and white students alike are, with no meaningful distinction, enjoying the benefits of their teachers’ substantial experience.
The difference in post-graduate education between black-school and white-school faculties is more pronounced. For every three teachers holding advanced degrees who ply their craft at imbalanced-white schools, there are only two similarly qualified teachers assigned to schools that are imbalanced-black. Compared to the district average, white schools have a somewhat larger proportion of these highly trained instructors, while the allotment granted to black schools is slightly less than the norm.
Although these facts give us reason for concern, we think it imprudent to disturb the district court’s conclusion that the trial evidence affirmatively disclosed no link between past discrimination and the current asymmetry. Most revealing on this point is that, until now, the issue of teacher quality within CMS has not been contested. The 1970 desegregation order mandating equal competence and experience in faculty assignments was not meant to remedy disparities then existing, but was instead intended to caution against future imbalances. In the intervening thirty years, there is little indication that CMS has neglected to heed the warning inherent in that order. We therefore agree that the district court did not clearly err in concluding that the developing disparities in teacher assignments and any (perhaps superficial) deficiency in the quality of instruction currently afforded African-American children are unrelated to the de jure segregation once prevalent in the school system.[20]

5. Staff

In substantially the same manner as it spoke to the allocation of teachers, the final desegregation order provided that “the internal operation of each school, and the assignment and management of school employees, of course be conducted on a non-racial, non-discriminatory basis.” *397 Swann, 311 F.Supp. at 269. Inasmuch as the Swann plaintiffs raised no challenge to the school system’s compliance with the desegregation order in this regard, the court below found CMS to have achieved unitary status with regard to its support staff. We agree that this aspect of the district court’s judgment should be affirmed.

6. Extracurricular activities

According to the evidence at trial, African-American students in CMS participate in athletics and hold class office at a rate proportionate to their numbers. These same students lag far behind, however, when it comes to participating in co-curricular clubs and honors programs. J.A. 11634. However, the scope of our inquiry concerning extracurricular activities is limited. We need only determine whether the school system permits its students equal access to extracurricular activities, without regard to race. Coalition to Save Our Children v. State Bd. of Educ. of Delaware, 90 F.3d 752, 768-69 (3d Cir.1996) (citation omitted); see also Swann, 402 U.S. at 18-19, 91 S.Ct. 1267 (“[T]he first remedial responsibility of school authorities is to eliminate invidious racial distinctions. With respect to such matters as transportation, supporting personnel, and extracurricular activities, no more than this may be necessary.... In these areas, normal administrative practice should produce schools of like quality, facilities, and staffs.”).
The criterion of equal access is surely satisfied in this regard. Participation in honors programs and co-curricular clubs is strictly voluntary, and there is no evidence that the lack of participation by African-American students in certain activities reflects the efforts of CMS to exclude them. We discern no error in the district court’s conclusions regarding this Green factor.
C.
Pursuant to the foregoing, we agree that the district court should be affirmed in its determination of unitary status with respect to faculty, staff, extracurricular activities, and student discipline. However, we believe that the court’s judgment should be vacated and the case remanded for further consideration in the areas of student assignment, facilities, transportation, and student achievement.
III.
We now turn to the question of whether the Board’s adoption of the expanded magnet schools program with its race-conscious assignment policy violates the Constitution. We conclude that it does not.[21] See also Wilkinson Op. at 353-355.
At the outset, we note that it is undisputed that this expanded magnet schools program differs in critical respects from all race-based student assignment plans that have been held to be in conflict with the Equal Protection Clause. Unlike school districts found to have violated the Constitution, CMS adopted the challenged program while operating a dual, segregated school system, under a myriad of court orders commanding the Board to eliminate the unlawful segregation.
The court orders — the public record attests to their numerosity and demands— require CMS to use its expertise and best efforts to desegregate its schools promptly. The federal court repeatedly directed *398 the school board to employ its “full ‘know-how’ and resources” to use “any means at [its] disposal” to do away with the unconstitutionally segregated school system. Swann, 311 F.Supp. at 269; accord Swann, 318 F.Supp. at 802 (characterizing this directive as the “most important single element” of its order); see. also Swann, 402 U.S. at 15, 91 S.Ct. 1267 (“[S]chool authorities are ‘clearly charged with the affirmative duty to take whatever steps might be necessa'ty to convert to a unitary system in which racial discrimination would be eliminated root and branch.’ ”) (quoting Green, 391 U.S. at 437-38, 88 S.Ct. 1689) (emphasis added); Swann, 379 F.Supp. at 1105 (giving CMS the authority to resolve “the sizeable continuing problems yet remaining ... by spontaneous action by staff or board”); Swann, 306 F.Supp. at 1297 (leaving “[t]he choice of how to do the job of desegregation” to CMS, and noting it “has wide discretion in choosing methods”) (emphasis added); Swann, 300 F.Supp. at 1360 (providing CMS with authority “to consider all known ways of desegregation ”) (emphasis added). Accord Freeman, 503 U.S. at 485, 112 S.Ct. 1430 (“The duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional de jure system.”) (first emphasis added).
Nor is there any doubt that at the time CMS adopted the expanded magnet schools plan, it was not a unitary school system. This is because even if Judge Potter did not err in decreeing that CMS has now achieved unitary status (and we believe he did), prior to his decision, no court had ever determined that CMS had attained unitary status. As the Capac-chione plaintiffs concede, Judge Potter’s decision — not some earlier event — “terminated[the] injunction” issued by Judge McMillan and affirmed by the Supreme Court. Brief of Appellees at 3.
Judge Potter properly acknowledged both the governing court orders and the fact that the remedial measures CMS took pursuant to them, including expansion of its magnet schools program, could not be analyzed as if taken by a “de facto” unitary school district. See Capacchione, 57 F.Supp.2d at 285 (“The Court finds no legal basis for a finding of de facto unitary status that would abrogate CMS’s immunity retroactively. In other words, the termination of court supervision cannot ‘relate back’ to an earlier time.”). Yet, notwithstanding CMS’s undisputed status as a dual school district under multiple court orders to desegregate its schools, the judge held that the Board’s adoption of the expanded magnet schools program violated the Equal Protection Clause. Furthermore, he found this constitutional violation rendered CMS liable to the Ca-pacchione plaintiffs for damages and enormous attorney’s fees.
The Capacchione plaintiffs seek to uphold that ruling on several grounds. First and principally, they contend that the Board’s increased reliance on magnet schools constituted a “voluntary desegregation plan implemented to counteract demographic change,” rather than a good faith effort to eliminate the vestiges of discrimination as required by the court orders governing this case. Second, they argue that the expanded program’s race-conscious assignment policy violated the existing desegregation orders. Finally, they maintain that, even if CMS expanded its magnet schools program pursuant to and in compliance with governing court orders, strict scrutiny nonetheless applies and requires that the program be held unconstitutional. The district court properly rejected the first and third arguments, and the dissent does not seek to resurrect them. Accordingly, although we address all of these contentions, we initial *399 ly examine the second, the only one on which the district court, or the dissent, relies.
A.
In concluding that the expanded magnet schools program violated the Constitution, the district court committed two fatal errors. Initially, it ignored the extent of the protection afforded an entity governed by federal court orders. Then, the district court refused to recognize the broad directives and expansive terms of the controlling court orders, and so failed to appreciate that the Board expanded its magnet schools program in good faith to comply with these orders, and thus cannot be held to have violated the Constitution. The dissent replicates both errors.
1.
Judge Potter, like the dissent, does pay lip service to the “immunity” the Board enjoyed because it was subject to numerous judicial desegregation decrees, see, e.g., Capacchione, 57 F.Supp.2d at 285 (“CMS enjoys immunity from liability for any actions it took consistent with the Court’s injunction.”); Traxler Op. at 46. But the district court and the dissent apparently do not understand what the numerous court orders in this case required of CMS and the breadth of the protection those orders afforded to it. Thus, both Judge Potter and the dissent mention the subject only in passing, failing even to cite controlling Supreme Court cases on point. See id.
A person or entity subject to a judicial decree or injunction (as CMS indisputably was when operating its dual, segregated school system) must comply with that decree or injunction, notwithstanding its possible unlawfulness. Thqs, the Supreme Court has clearly and unequivocally directed that “persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order.” GTE Sylvania, Inc. v. Consumers Union of the United States, 445 U.S. 875, 386, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980) (emphasis added); see also W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983).
The only possible exceptions to this “important public policy,” W.R. Grace, 461 U.S. at 766, 103 S.Ct. 2177, arise if a court lacks jurisdiction over the subject matter of the order or the order has “ ‘only a frivolous pretense to validity.’ ” GTE, 445 U.S. at 386, 100 S.Ct. 1194 (quoting Walker v. City of Birmingham, 388 U.S. 307, 315, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967)). Without question, the federal court had jurisdiction over the subject matter of the desegregation orders issued in this ease and no one suggests that those orders constituted “only a frivolous pretense to validity.”
Accordingly, CMS had to obey those orders. This is so notwithstanding that those orders may have required the Board to forego competing obligations, see W.R. Grace, 461 U.S. at 767-68, 103 S.Ct. 2177, including obligations seemingly required by a federal statute, see GTE, 445 U.S. at 378 & n. 2, 386-87, 100 S.Ct. 1194, or the Constitution itself, see Walker, 388 U.S. at 317, 87 S.Ct. 1824. Indeed, the Súpreme Court has explained that to hold that an entity acts “improperly” in obeying a valid court order “would do violence to the common understanding of the term ‘improperly,’ ” even if the order is later held unlawful or unconstitutional. GTE, 445 U.S. at 387, 100 S.Ct. 1194. Moreover, a court order need not mandate specific or precise procedures to compel obedience. Thus, although the Court noted the “breadth and vagueness” of the injunction challenged in *400 Walker, it nonetheless held that the injunction had to be obeyed until “modified or dissolved.” Walker, 388 U.S. at 317, 87 S.Ct. 1824.
“Violations of [a court] order are punishable as criminal contempt even though the order is set aside on appeal.” United States v. United Mine Workers, 330 U.S. 258, 294, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Accord Spangler, 427 U.S. at 438, 96 S.Ct. 2697 (“Violation of an injunctive decree ... can result in punishment for contempt in the form of either a fine or imprisonment”). Conversely, when a person or entity acts in good faith to comply with a court order, it should not be punished. Thus, in words that resound here, the Supreme Court has explained that “a school board and a school constituency which attempt to comply with a[court-ordered desegregation] plan to the best of their ability should not be penalized.” Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 421, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977).
Indeed, the Supreme Court has twice expressly held that school boards under court orders to desegregate must comply with those desegregation decrees until absolved of that obligation by a subsequent court order, even if the existing desegregation decrees are improper or unnecessary. In Spangler, the Court concluded that the district court exceeded its remedial discretion when it ordered the Pasadena school district to reconfigure its student attendance zones annually so that there would be “no majority of any minority” in any school. 427 U.S. at 434-35, 96 S.Ct. 2697. Despite the impropriety of this order, the Court held that the school board had to obey the order until it was properly modified or reversed by a court. See id. at 439-40, 96 S.Ct. 2697 (“[T]hose who are subject to the commands of an injunctive order must obey those commands, notwithstanding eminently reasonable and proper objections to the order, until it is modified or reversed.”).
Similarly, in Dowell, the Court refused to interpret an arguably ambiguous court order as having terminated the desegregation decree previously entered against the Oklahoma City school board. Instead, the Court remanded the case to the district court for a determination of “whether the Board made a sufficient showing of constitutional compliance ... to allow the injunction to be dissolved.” Dowell, 498 U.S. at 249, 111 S.Ct. 630. In doing so, the Court explained that judicial orders carry binding authority until they are modified or dissolved.
Moreover, the Dowell Court rejected precisely the kind of argument the Capac-chione plaintiffs seek to make here. In Dowell, as here, those challenging the school board’s actions argued (and the court of appeals found) that the school board “unilaterally and contrary to specific provisions” of the controlling court orders “acted in a manner not contemplated by the court in its earlier decrees.” Dowell by Dowell v. Bd. of Educ. of Okla., 795 F.2d 1516, 1521 (10th Cir.1986). The Supreme Court acknowledged that this might well be so, but concluded that nonetheless it did “not think that the Board should be penalized for relying on the express language of that order.” Dowell, 498 U.S. at 249 n. 1, 111 S.Ct. 630. Similarly, even if CMS had “acted in a manner not contemplated” in the governing orders — and clearly it did not, see infra, at part III. A.2 — it should not “be penalized for relying on the express language” of those orders, Dowell, 498 U.S. at 249 n. 1, 111 S.Ct. 630, i.e., “to use [its] full ‘know-how and resources ... to achieve the constitutional end [i.e., desegregation of the schools] by any means at [its] disposal.” Swann, 318 F.Supp. at 802.
*401 Of course, the Capacchione plaintiffs could have sought to modify or dissolve the Swann orders as inconsistent with then-rights under the Constitution; what they could not do is obtain an injunction, or declaration, that a party compelled to adhere to those orders violated the Constitution in so doing. CMS was obliged to follow the governing desegregation orders and injunctions, and thus the Board “should not be penalized,” Brinkman, 433 U.S. at 421, 97 S.Ct. 2766, for its actions, which were taken to comply with those orders and which the district court found, and the dissent does not dispute, were taken in good faith. See Trader Op. at 41.
With these principles in mind, we turn to the desegregation orders in this case and the Board’s actions in response to those orders.
2.
Throughout the course of the desegregation efforts in this case, the federal courts — from the district level to the Supreme Court — have told the Board that it has the authority to take “whatever steps might be necessary to convert to a unitary system.” Swann, 402 U.S. at 15, 91 S.Ct. 1267; see also Swann, 300 F.Supp. at 1360 (“The Board is free to consider all known ways of desegregation.’’) (emphasis added). Thus, CMS has continually acted under judicial directives that “[t]he choice of how to do the job of desegregation is for the School Board — not for the court.” Swann, 306 F.Supp. at 1297. See also Wilkinson Op. at 353-355.
Even beyond CMS’s broad discretion to choose its own methods of eliminating its unconstitutionally segregated schools, Judge McMillan’s orders repeatedly endorsed the Board’s general power and duty to maintain control over the racial composition of the schools in order to eliminate the vestiges of the segregated system “root and branch.” For instance, in 1970 Judge McMillan mandated:
That the defendants maintain a continuing control over the race of children in each school ... and maintain the racial make-up of each school (including any new and any reopened schools) to prevent any school from becoming racially identifiable.... The duty imposed by the law and by this order is the desegregation of schools and the maintenance of that condition.... The defendants are encouraged to use their full ‘know-how’ and resources to attain the results above described, and thus to achieve the constitutional end by any means at their disposal. The test is not the method or plan, but the results.
311 F.Supp. at 268-69 (emphasis added and emphasis omitted); see also 362 F.Supp. at 1225 (same); 334 F.Supp. at 631 (same); 475 F.Supp. at 1342 (approving counsel’s statement that “if this Board of Education chose to run an integrated school system on the basis of preconceived ratios, it has that constitutional right”) (emphasis added); 318 F.Supp. at 801 (ordering “[tjhat ‘freedom of choice’ or ‘freedom of transfer’ may not be allowed by the Board if the cumulative effect of any given transfer or group of transfers is to increase substantially the degree of segregation in the school from which the transfer is requested or in the school to which the transfer is desired”).
Moreover, Chief Justice Burger’s opinion for the Supreme Court in Swann provides explicit sanction of the Board’s use of racial “ratios” or proportions in assigning students to schools:
School authorities are traditionally charged with broad power to formulate and implement education policy and might well conclude, for example, that in order to prepare students to live in a *402 pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court.
402 U.S. at 16, 91 S.Ct. 1267 (emphasis added).[22]
Not only was CMS empowered to use ratios in student assignments generally, it was also specifically authorized to use race-conscious assignment policies for “appropriately integrated optional schools.” Swann, 379 F.Supp. at 1103. Judge McMillan approved the Board’s policy, which provided:
Strict and central control must be exercised over all admissions (reassignments) to each optional school in order to fulfill the necessary ends that these schools be open to all county residents and be integrated by grade at or above approximately a 20% black ratio. Reassignments to optional schools must not jeopardize the racial composition of any other school.
Guidelines and central monitoring by the Pupil Assignment staff with the respective school principals are to' be drawn up. Capacities and allocation of maximum numbers of students that may be drawn from each other school attendance area, by race, are to be designated. The actual enrollment of the optional school may have to be guided by its racial composition and by the number drawn from each other school area, not by considerations of space and program only.
Id. at 1108 (emphasis added).
In response to these directives, in the 1970s CMS established some magnet schools, which it called “optional schools.” These schools offered two special curricula — “open” and “traditional” — both of which constituted “very rigorous academic program[s]” not offered in “conventional schools.” J.A. 2489, 15683. In 1992, the Board expanded its magnet schools program into a district-wide system with a wider range of curricular choices. In the expanded magnet schools program, the Board retained the curricula first available in the early magnet or “optional” schools— the “open” curriculum emphasizing “interdisciplinary approaches,” and the “traditional” curriculum featuring a “highly structured program.” J.A. 16722-23. Furthermore, six of the early magnet schools that offered such curricula prior to 1992 — Myers Park, Elizabeth, Hawthorne, Irwin Avenue, Piedmont, and West Charlotte — continue to do so today under the expanded magnet schools program. Compare J.A. 13448, 13529-40,15683 (pre-1992 “open” and “traditional” magnets) with J.A. 16722-23 (1998-99 “open” and “traditional” magnets); see also J.A. 10061 (report indicating that pre-1992 magnet schools were incorporated into the 1992 expanded magnet schools program).[23]
*403 The expanded magnet schools program is a typical and appropriate desegregation tool “conceived and developed in large, urban school districts seeking a voluntary alternative to busing as a means of decreasing racial segregation.” J.A. 10654. Even the dissenters recognize that “a magnet schools program, properly implemented, can no doubt be an effective desegregation tool.” Traxler Op. at 50. But they nonetheless suggest that the expanded magnet schools program, in and of itself, may violate the Constitution. See id. at 352-354. This suggestion is surprising, given that the federal courts have consistently approved magnet school plans as desegregation tools. See, e.g., Milliken v. Bradley, 433 U.S. 267, 272, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) {Milliken II); Stell v. Savannah-Chatham County Bd. of Educ., 888 F.2d 82, 85-86 (11th Cir.1989); Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1, 839 F.2d 1296, 1309-12 (8th Cir.1988); United States v. Yonkers Bd. of Educ., 837 F.2d 1181, 1237-39 (2d Cir.1987); Liddell v. Missouri, 731 F.2d 1294, 1310-11 (8th Cir.1984). The dissent’s suggestion that CMS somehow violated the Constitution by expanding its magnet schools program and “abandon[ing] pairings, satellites, and feeders,” Traxler Op. at 50, seems particularly extraordinary. Magnet schools are generally regarded as being a less onerous and more successful desegregation tool than pairing, satellites, or feeders because magnet schools provide more opportunity for student choice. See, e.g., Stell, 888 F.2d at 85; Yonkers, 837 F.2d at 1239.
Of course, as Judge McMillan warned, in approving the early magnet or optional schools, assignment of pupils to such schools must be undertaken in a manner that “provide[s] ... access to appropriately integrated optional schools,” and “prevent[s] significant jeopardy to the racial composition of other schools.” Swann, 379 F.Supp. at 1103.[24] For this reason, race is, *404 and must be, considered in assigning students to the magnet schools instituted under CMS’s expanded program, just as it was in assigning students to the original magnet or optional schools. See 379 F.Supp. at 1108. Specifically, under the expanded program, CMS allocates 40% of the seats in its magnet schools for black students and 60% for students of other races. This ratio reflects the student population of the school system, which is approximately 41.0% black, 52.2% white, 3.7% Asian, 2.5% Hispanic, and 0.5% American Indian. CMS generally assigns students to its magnet schools using two parallel lotteries, one for black students and one for white students. When there has been insufficient interest from black students to fill the seats allocated to them in a particular school, CMS has sometimes refused to allow students of other races to fill those slots. Thus, race may affect a student’s chances of being assigned to a magnet school.
It is this portion of the expanded magnet schools program that Judge Potter regarded as unconstitutional, reasoning that Judge McMillan “firmly rejected the use of rigid racial quotas.” Capacchione, 57 F.Supp.2d at 286 (relying on Swann, 306 F.Supp. at 1312). In reaching this conclusion, Judge Potter misread the order on which he assertedly relied and ignored the multiple other orders and injunctions governing this case.
Actually, in the very paragraph on which Judge Potter relied, in which Judge McMillan held that “[f]ixed ratios of pupils in particular schools will not be set” by the court, Judge McMillan also held that “efforts should be made [by the school board] to reach a 71-29 ratio in the various schools so that there will be no basis for contending that one school is racially different from the others.” Swann, 306 F.Supp. at 1312 (emphasis added). Judge Potter transmuted this statement — an authorization for the Board to make “efforts” to “reach a 71-29 ratio” — into a prohibition against the Board assigning students to schools on the basis of that fixed ratio. See Capacchione, 57 F.Supp.2d at 286. We cannot accept this reading of Judge McMillan’s order. Taken as a whole, this paragraph provides some of the clearest evidence that Judge McMillan not only authorized the Board to use fixed ratios in assigning students to schools but encouraged it to do so. Recognizing the impracticability of adopting a court-ordered, system-wide racial balance to which all schools must adhere, Judge McMillan did observe that “variations from that [71-29 ratio] may be unavoidable.” Swann, 306 F.Supp. at 1312. But that statement imposes no limitations on the scope of permissible Board action. Rather, it suggests that “variations” were acceptable only because they were “unavoidable.”
The Board could not have accomplished what the desegregation orders required without “using race” in the way that it “used race” in the context of the expanded magnet schools program. In the 1970 order, affirmed by the Supreme Court, *405 Judge McMillan decreed “[t]hat pupils of all grades be assigned in such a way that as nearly as practicable the various schools at various grade levels have about the same proportion of black and white students.” Swann, 311 F.Supp. at 268. We cannot fathom how the Board could set out to achieve “about the same proportion of black and white students” in each grade level in each of its over one hundred schools without employing fixed racial ratios as the central components of its student assignment plan. Neither, apparently, could Judge McMillan.
To achieve “about the same proportion,” the Board necessarily had to set fixed upper and lower limits on the proportion of white and black students it would permit in each grade in each school. Only with these fixed racial proportions as its lodestars could the Board assign students to schools, and approve or deny individual requests to transfer. The Board could never have justified a denial of a transfer request without having a fixed conception of exactly how few white or black students in a particular school would be too few.
Indeed, Judge McMillan expressly approved many aspects of the CMS desegregation plan that were explicitly based on strict racial ratios. For example, the Board’s majority-to-minority transfer policy, which was specifically authorized by the governing desegregation orders, takes race into account in much the same way as the magnet schools assignment policy. Under the transfer policy, a student in the racial majority in his current school could freely transfer to a school in which he would be in the racial minority. A white student in a majority white school, for example, could freely transfer to a majority black school, but that same student could be denied admission to a majority white school, solely on the basis of a rigid 50% racial ceiling. Meanwhile, a black student at a majority black school could freely transfer into the same majority white school to which the white student might be denied admission. The Supreme Court approved this use of majority-to-minority transfer policies as “a useful part of every desegregation plan” and “an indispensable remedy.” Swann, 402 U.S. at 26, 91 S.Ct. 1267. In fact, Judge McMillan specifically upheld this majority-to-minority plan, despite former CMS Superintendent Dr. J.M. Robinson’s complaints about the rigidity of the 50% limit. See Martin, 475 F.Supp. at 1343 (“I would like to have had more flexibility than the 50 percent in some instances, but I would be opposed to recommending any plan that went, any of the schools going over more than a few percentage points above 50 percent.”).
It is certainly true that Judge McMillan’s orders and the Supreme Court’s opinion in Swann consistently signaled concern with the imposition of racial proportions or ratios by federal courts. That concern, however, is rooted in the problem of federal courts exceeding their remedial discretion, not in any objection to the use of racial proportions or ratios by school boards themselves in their desegregation plans. Thus, the Supreme Court noted that, “[t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole,” but went on to conclude that “the very limited use made of mathematical ratios was within the equitable remedial discretion of the District Court.” Swann, 402 U.S. at 24-25, 91 S.Ct. 1267.
That this concern with ratios is rooted in the limits of judicial power to order remedial action, not in the impropriety of using racial proportions to remedy the vestiges of segregation, is nowhere more apparent than in Chief Justice Burger’s statement *406 in Swann. There, the Chief Justice noted that while in certain circumstances it might be inappropriate for a federal court to require adherence to “a prescribed ratio of Negro to white students reflecting” the population of the “district as a whole,” it would be “within the broad discretionary-powers of school authorities” to do so. Id. at 16, 91 S.Ct. 1267. See also Wilkinson Op. at 354.
Indeed, in Swann’s companion case, North Carolina State Bd. of Educ. v. Swann, 402 U.S. 43, 45-46, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971), the Supreme Court held that any attempt to “inhibit or obstruct” the Board’s use of racial ratios “must fall.” The Court explained that, “when past and continuing constitutional violations are found [as they had been in the Charlotte-Mecklenburg school system], some ratios are likely to be useful starting points in shaping a remedy. An absolute prohibition against use of such a device ... contravenes the implicit command of Green.” Id. at 46, 91 S.Ct. 1284. The Court expressly recognized that a “flat prohibition against assignment of students for the purpose of creating racial balance must inevitably conflict with the duty of school authorities to disestablish dual school systems.” Id. (emphasis added).
The Board’s authority to employ racial ratios is explicit not only in the Supreme Court’s opinions, but also in Judge McMillan’s repeated statements to the effect that “[independent of any court order ... if this Board of Education chose to run an integrated school system on the basis of preconceived ratios, it has that constitutional right.” Martin, 475 F.Supp. at 1342 (internal quotation marks omitted). In fact, early in the litigation Judge McMillan held that:
Counsel for the plaintiffs says that since the ratio of white to black students is about 70/30, the School Board should assign the children on a basis 70% white and 30% black, and bus them to all the schools. This court does not feel that it has the power to make such a specific order. Nevertheless, the Board does have the power to establish a formula and provide transportation.
Swann, 300 F.Supp. at 1371 (emphasis added).
Moreover, this Court upheld “the validity of the Board’s decision to reassign students in order to maintain racial ratios,” and stated that the “School Board is vested with broad discretionary powers over educational policy and is well within its powers when it decides that as a matter of policy schools should not have a majority [over 50%] of minority students.” Martin, 626 F.2d at 1167. Having been repeatedly told by federal courts that it had the “constitutional right” to “maintain racial ratios” to remedy past segregation, CMS cannot now be held to have violated the Constitution for doing exactly what the courts have said it had the power to do.
In short, time and again, the federal courts at all levels have authorized the Board to employ racial ratios to remedy its unlawfully segregated school system. Although the dissent repeatedly contends to the contrary, Traxler Op. at 52, 54, 55, no court has ever prohibited CMS (rather than the federal court supervising it) from imposing “racial ratios.” The dissent’s contention that Judge McMillan’s order— mandating a black student population “about or above 20%” in the optional schools, instead of the Board’s proposed “at or above approximately 20%” language — constitutes a rejection of “rigid racial quotas,” Traxler Op. at 53, is singularly unconvincing. It seems unlikely that by this slight word difference Judge McMillan even indicated a disapproval of the Board’s use of “rigid” quotas, which would other *407 wise have been permitted under the Board’s policy. It seems far more likely that Judge McMillan believed that his order permitting a racial ratio “about or above 20%” was equivalent to the Board’s policy of permitting a racial ratio “at or above approximately 20%.” In any event, neither linguistic formulation prohibits the Board from adopting an 80-20 ratio for the early optional schools, or the 60-40 ratio for magnet schools that it subsequently adopted in 1992, especially in light of the Board’s broad discretion and explicit authorization to use strict racial ratios in other areas of its desegregation plan.
Similarly, the dissent’s suggestion that the expanded magnet schools program differs from the “optional schools” program because the Board set “inflexible quotas” in the expanded plan, Traxler Op. at .44, is simply not borne out by the record. In truth, in 1992, CMS implemented a 60 — 40 white-black ratio with an eye to reaching a racial balance that corresponded with the make-up of the entire student population of the school system, just as in 1974 it implemented the 80-20 white-black ratio to correspond with the entire student population at that time. The 60-40 ratio was not applied in any more of a rigid or “inflexible” manner than the earlier ratio; Board policy provided that “all magnet schools would maintain a 60-40 white-black ratio plus or minus 15%, ” J.A. 13705; see also J.A. 3187, 3193, and the Student Assignment Plan permitted “racial balance [to] be allowed to fluctuate.” J.A. 15702. The Board’s Executive Director of Planning and Student Placement testified that several race-neutral considerations, such as sibling attendance, would allow a school to “depart- from the 60-40 goal.” J.A. 3217; see also J.A. 3091-92, 3193-94. Contrary to the dissent’s claims of rigidity, not a single magnet school actually manifested a 60-40 ratio. J.A. 3185. A number of magnet schools came close to the stated goal, but the percentage of black students in CMS’s magnet schools ranged from 7% to 82%, id., and students that failed to gain admission to one magnet school “often ha[d] a seat waiting for them at another magnet school of them choosing.” J.A. 3076. In fact, the two “black seats” about which Christina Capacchione originally complained were ultimately filled by two white students, despite the supposedly “inflexible” ratio. In sum, the 60-40 ratio was not an unbendable “quota,” either in policy or in practice, any more than the earlier ratio had been.
Both the Supreme Court and Judge McMillan provided CMS with “wide discretion” to fashion appropriate remedies in light of the particular needs of its pupils and the school system’s experience with other desegregation tools. Additionally, Judge McMillan approved specific race-conscious assignment measures generally and specifically as to magnet schools.[25] Thus, when adopting a 60 — 40 assignment formula in the expanded magnet schools *408 program, the Board not only acted within its “wide discretion,” but also in accordance with specific procedures approved by the district court.
Judge Potter’s conclusion (and the dissent’s contention) to the contrary simply cannot be reconciled with the Supreme Court opinion in Swann, our opinions in this case, and Judge McMillan’s decrees. The magnet schools’ race-conscious assignment policy constitutes a necessary safeguard against the risk that unchecked transfers to magnet schools could increase the number of racially identifiable schools in violation of the Board’s continuing obligation under the desegregation orders. See 379 F.Supp. at 1105 (“Racially identifiable schools may not be operated.”). In that vein, the Capacchione plaintiffs’ own expert on school desegregation, Dr. David Armor, agreed that racial quotas are permissible in a desegregation plan. J.A. 3627. Dr. Armor testified that “race is an integral part of pairing, of satelliting, of magnet schools, of running lotteries for magnet schools. The entire plan is predicated on race and race controls, because that’s the only way you can meet the court order and to have an effective plan is to employ race requirements and racial quotas basically for all schools.” J.A. 3434.
In sum, contrary to Judge Potter’s conclusion, Judge McMillan specifically authorized the use of fixed ratios based on race in assigning students to magnet schools. See 379 F.Supp. at 1104. Furthermore, even without such specific authorization, the broad discretion granted the Board by the Supreme Court’s opinion in Swann and by the other court orders and injunctions governing this case permitted CMS to fashion magnet schools with racially balanced enrollments. The decrees make plain that ratios based on race were among the “means” by which the Board was authorized “to achieve the constitutional end” of desegregation. Swann 311 F.Supp. at 268-69; see also Swann, 362 F.Supp. at 1225; Swann, 334 F.Supp. at 631. As such, the Board did not violate the Equal Protection Clause in adopting such ratios in its expanded magnet schools program.
B.
As their principal contention, the Capac-chione plaintiffs argue that the expanded magnet schools program was a response to demographic change rather than a true attempt to remedy past discrimination. We cannot agree.[26]
First, Judge Potter “accept[ed] that the school system was acting to ... remedy[ ] the effects of past racial discrimination” in expanding the number of magnet schools in 1992. Capacchione, 57 F.Supp.2d at 289. Ample record evidence supports this finding. See, e.g., J.A. 2716 (testimony of John Murphy, former CMS Superintendent, that 1992 plan to expand the magnet school program was among the “creative strategies we could come up with to stay in compliance with the court order”); J.A. 3869-74 (testimony of Jeff Schiller, former assistant superintendent for research, assessment, and planning for CMS, explaining that the 1992 student assignment plan, including the expanded magnet schools program, “had the same objectives as the one that it was going to replace, maintaining the court order,” and that the objective of the expanded magnet program specifically was “to maintain the integration of schools through voluntary means”); J.A. 15503-05 (1993 letter from CMS to the U.S. Department of Education discussing Judge McMillan’s 1974 order and identifying the creation of additional magnet schools as among the “more effective ways ... [to] meet[ ] the guidelines established *409 by the Court”); J.A. 13607, 15582 (Stolee Plan recommendation that “[t]he Charlotte-Mecklenburg school desegregation plan should be gradually changed from a mandatory plan with little voluntarism to a voluntary plan with few mandatory facets”).
Furthermore, the dichotomy the Capac-chione plaintiffs suggest between “countering] demographic change,” on the one hand, and remedying past discrimination, on the other, oversimplifies both the law of school desegregation, particularly the Supreme Court’s decisions in Green, Swann, and Freeman, and the practical reality of achieving desegregation in a large urban school district. From the early stages of the Swann litigation, all concerned have understood that demographic patterns would complicate the process of school desegregation. Indeed, remedies such as school busing and satellite attendance zones would never have been necessary in the first place if the demography of the community were not an obstacle to desegregation. In a sense, Swann’s basic teaching is that the Constitution sometimes requires schools to “counter demo-graph[y]” in order to achieve desegregation. The Swann Court noted that the process of “local authorities ... meeting] their constitutional obligations” had “been rendered more difficult by changes ... in the structure and patterns of communities, the growth of student population, [and] movement of families.” 402 U.S. at 14, 91 S.Ct. 1267. The Court expressed concern that “segregated residential patterns ... [would] lock the school system into the mold of separation of the races.” Id. at 21, 91 S.Ct. 1267. Thus, CMS simply followed the Supreme Court’s guidance in Swann in regarding change as a problem inhibiting its progress toward unitary status.[27]
Moreover, Freeman simply did not hold, as the Capacchione plaintiffs necessarily imply, that demographic changes in a metropolitan area independently eliminate the *410 vestiges of past discrimination. Nor does Freeman bar courts from targeting racial isolation resulting in significant part from “private choice,” if that isolation is also a vestige of past discrimination. The effect of such a holding in Freeman would have been to overrule Green, which the Supreme Court did not purport to do. In Green, even though the school board allowed every student “freedom of choice” as to which school to attend, the formerly black school remained all black and the formerly white school remained predominantly white-wholly as a result, in some sense, of this “private choice.” The Green Court held that, although the private choices of students and their families were responsible for the continuing racial isolation of the schools’ student populations, that fact did not preclude a finding that the racial isolation was also a vestige of past discrimination. Indeed, the Court held not only that it was permissible for the school board to take further action to desegregate, but that the board was required to take further action in order to fulfill its “affirmative duty” to desegregate. Green, 391 U.S. at 437-38, 88 S.Ct. 1689.
Although Freeman recognized that, at a certain point in the process of desegregation, a court may determine that present racial isolation cannot be considered a byproduct of the past regime of segregation, the case does not require — or even empower — a school board under a judicial desegregation order to make that determination on its own. Rather, so long as CMS was under court order to desegregate, it was required to treat racial isolation in its schools as a vestige of segregation, and to take appropriate action to eliminate that vestige. See Swann, 402 U.S. at 26, 91 S.Ct. 1267.
C.
Finally, the Capacchione plaintiffs maintain that, even if CMS administered the expanded magnet schools program pursuant to and in conformity with the governing desegregation decrees, CMS violated the Constitution in doing so. Judge Potter rejected this argument, as do we (and the dissent, in never mentioning it, apparently also rejects it). The Capacchione plaintiffs rely on inapposite case law in attempting to establish that Board actions taken pursuant to court-ordered desegregation decrees can be held unconstitutional.
Specifically, they rely on recent decisions finding voluntary, race-conscious magnet school programs (not developed under a governing desegregation order) unconstitutional. See Eisenberg v. Montgomery County Pub. Schs., 197 F.3d 123, 125 (4th Cir.1999); Tuttle v. Arlington County Sch. Bd., 195 F.3d 698 (4th Cir.1999); see also Wessmann v. Gittens, 160 F.3d 790 (1st Cir.1998). In fact, the courts emphasized in those cases that the school system had not been under a court order to desegregate, see Eisenberg, 197 F.3d at 124, and had adopted a magnet program “not to remedy past discrimination, but rather to promote racial, ethnic, and socioeconomic diversity.” Tuttle, 195 F.3d at 700 (emphasis added); see also Wessmann, 160 F.3d at 792 (noting that prior to instituting its magnet program the school system “had achieved unitariness in the area of student assignments” and that “the district court thereupon relinquished control over” that area). Indeed, in Eisen-berg we endorsed the permissibility of race-based classifications “in situations,” like that at hand, “where past constitutional violations require race-based remedial action.” 197 F.3d at 130 (citing Swann, 402 U.S. at 1, 91 S.Ct. 1267); see also Wessmann, 160 F.3d at 795.
The distinction between a unitary school system and a school system under court order to desegregate is, from a legal *411 standpoint, fundamental. Furthermore, as discussed supra, it is the judicial finding of unitary status, not any particular action by the school board or condition in the school system, upon which the distinction turns. Of course, for a formerly segregated school system, the attainment of unitary status reflects years or decades of gradual change, not an overnight shift in policy or outlook. Although CMS will not look much different the day it becomes unitary than it will have looked the previous day, attainment of unitary status triggers significant legal consequences. In a nonuni-tary school system, all one-race or predominantly one-race schools are presumed to be vestiges of segregation, and the burden is on the challenging party to show that those schools are nondiscriminatory. See Swann, 402 U.S. at 26, 91 S.Ct. 1267 (“The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part.”). Once a court has declared a school system unitary, on the other hand, the presumption is that the vestiges of segregation have been eliminated, and a plaintiff seeking to demonstrate a constitutional violation on the basis of the existence of one-race or predominantly one-race schools must “prove discriminatory intent on the part of the school board.” Riddick, 784 F.2d at 537.
As Judge Potter recognized, see Capacchione, 57 F.Supp.2d at 285, CMS implemented and administered its expanded magnet schools program prior to ever achieving unitary status and while still under court order to remedy the vestiges of segregation. Therefore, recent decisions, like Eisenberg and Tuttle, addressing the constitutionality of magnet school assignment policies in unitary school systems not under court order, are simply inapposite.
Moreover, even if Tuttle and Eisenberg generally applied to governmental acts performed pursuant to remedial desegregation orders (which they do not), the Board’s expanded magnet schools program would withstand constitutional scrutiny. This is so because if a precedent of the Supreme Court “has direct application in a case,” inferior courts must follow that precedent “even if later cases appear to call it into question, leaving to [the Supreme] Court the prerogative of overruling its own decisions.” See Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).
There could hardly be a clearer case for application of this principle. Here, the Supreme Court’s Sivann decision itself constitutes directly controlling precedent. In Swann, the Court concluded that CMS could be constitutionally required to make efforts “to reach a 71-29 ratio” in the schools under its authority, and to assign students “in such a way that as nearly as practicable the various schools at various grade levels have about the same proportion of black and white students.” See 402 U.S. at 23-25, 91 S.Ct. 1267 (approving Judge McMillan’s order). Indeed, the Supreme Court again noted in Freeman that its decision in Swann specifically approved racial balancing by CMS to achieve the remedial end of eliminating the vestiges of segregation. 503 U.S. at 493, 112 S.Ct. 1430 (In Swann, “[w]e confirmed that racial balance in school assignments was a necessary part of the remedy in the circumstances there presented.”). Under the principle articulated in Agostini, only the Supreme Court itself can modify the decrees in this case to prohibit what Swann so clearly permitted.
D.
The Supreme Court’s decision in Swann is the law of the case; it must be followed. *412 But more than just the law of this case, for almost thirty years Swann also has functioned as a blueprint for school desegregation in school districts throughout this Nation. As long as Swann is controlling law, and as long as the Board acts pursuant to the Swann desegregation orders — as it did in implementing the expanded magnet schools program — it cannot be held to have violated the Constitution.
IV.
Judge Potter also enjoined CMS from “assigning children to schools or allocating educational opportunities and benefits through race-based lotteries, preferences, set-asides, or other means that deny students an equal footing based on race.” Capacchione, 57 F.Supp.2d at 294. In considering the propriety of an injunction, we review factual findings only for clear error, but the “district court’s application of legal principles ... presents a legal question reviewed de novo.” North Carolina v. City of Virginia Beach, 951 F.2d 596, 601 (4th Cir.1992).
Given the Court’s holding today that CMS did not violate the constitutional rights of the Capacchione plaintiffs by consideration of race in its expanded magnet schools program, and because we would also hold that CMS has not yet achieved unitary status, there is, in our view, no legal basis for the district court’s injunction. Moreover, even if the district court properly determined that CMS had attained unitary status, the injunction still must be vacated. This is so because the district court could issue an injunction only to the extent that it concluded that CMS was likely to persist in current practices that would violate the Constitution if undertaken outside of the remedial context. See United States v. Oregon State Med. Soc’y, 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952). Judge Potter made no such finding.
Indeed, the only CMS action that Judge Potter held to violate the Constitution was .the expanded magnet schools program (a holding that this Court has now reversed); the judge did not consider the constitutionality of any other method of student assignment or resource allocation. Yet the injunction by its terms prohibits any consideration of race by CMS in student assignment or allocation of educational benefits that “den[ies] students an equal footing.” Capacchione, 57 F.Supp.2d at 294. The injunction thus goes much further than simply prohibiting CMS from reinstituting the expanded magnet schools program and its race-conscious assignment policy.
This court has repeatedly held similar injunctions too broad, explaining that “[a]l-though injunctive relief should be designed to grant the relief needed to remedy the injury to the prevailing party, it should not go beyond the extent of the established violation.” Hayes, 10 F.3d at 217; see also Tuttle, 195 F.3d at 708. Similarly, the Supreme Court has directed “fflederal court decrees must directly address and relate to the constitutional violation itself.” Milliken, 433 U.S. at 282, 97 S.Ct. 2749. Because the injunction issued in this case did not do this, it must be vacated.
V.
In addition to injunctive relief, the district court awarded nominal damages of one dollar to the Capacchione plaintiffs “to vindicate the constitutional rights of children denied an equal footing in applying to magnet schools.” Capacchione, 57 F.Supp.2d at 290. Because a majority of the Court holds that the expanded magnet schools program did not violate the Constitution, it follows that the nominal damages award must also be vacated.
*413 VI.
The district court awarded the Capac-chione plaintiffs $1,499,016.47, plus interest, in attorney’s fees, pursuant to 42 U.S.C. § 1988 (1994). See Capacchione v. Charlotte-Mecklenburg Schs., 80 F.Supp.2d 557 (W.D.N.C.1999) (amended by orders of December 16, 1999, J.A. 1313-15, and March 6, 2000, J.A. 1356-62). Under § 1988, a court is only permitted to award fees when a “party, other than the United States” prevails in an “action to enforce” the. Constitution or specific federal civil rights statutes. 42 U.S.C. § 1988. Because the Capacchione plaintiffs have not prevailed on any constitutional or other claim providing a basis for statutory attorney’s fees, the $1.49 million fee award must be vacated in its entirety.
We note initially that this Court’s reversal of the district court’s finding that CMS’s magnet schools program violates the Constitution obviously means that all attorney’s fees awarded in connection with the Capacchione plaintiffs’ previous success on this issue must be vacated. The district court apparently based much of its attorney’s fees award on this ground. See Capacchione, 80 F.Supp.2d. at 559 (awarding attorney’s fees in part because the “Court found for Plaintiff Capacchione on the core of his claim that CMS violated Cristina Capacchione’s constitutional rights under the Equal Protection Clause”) (emphasis added). Our Court today not only holds that CMS did not violate the Capacchione plaintiffs’ constitutional rights in adopting the expanded magnet schools program, but also reverses and vacates the district court’s attendant orders for injunctive and monetary relief. As the Capacchione plaintiffs themselves recognize, it is “self-evident” that they cannot recover attorney’s fees “if this Court reverses on the order appealed from.” Brief of Appellees at 113 n. 51. Given the reversal of the magnet schools ruling, the award of attorney’s fees attendant to it must be vacated.
The dissent maintains, however, that because this Court has also upheld Judge Potter’s unitary status ruling, the Capacchione plaintiffs are entitled to an award of some attorney’s fees. See Traxler Op. at 66.[28] Our Court properly rejects this notion because the unitary status determination alone simply provides no basis for an award of attorney’s fees. See also Wilkinson Op. at 353 & n. 1.
Just a few weeks ago, the Supreme Court removed all doubt in this area. In Buckhannon Bd. and Care Home, Inc. v. W. Va. Dept. of Health and Human Res., 532 U.S. 598, 121 S.Ct. 1835, 1839, 149 L.Ed.2d 855 (2001), the Court reiterated that “[i]n the United States, parties are ordinarily required to bear their own attorney’s fees — the prevailing party is not entitled to collect from the loser.” In accord with the traditional “American Rule,” courts may not award attorney’s fees to *414 the prevailing party absent explicit statutory authority. See id. (citing Key Tronic Corp. v. United States, 511 U.S. 809, 819, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994)). Indeed, in Buckhannon, the Supreme Court noted that statutory authority to award attorney’s fees is critical, for “Congress ha[s] not ‘extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted.’” Buckhannon, 121 S.Ct at 1843 (quoting Alyeska Pipeline Serv. Co. v. Wilderness Soc’y, 421 U.S. 240, 260, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)).
In this ease, there is simply no statutory basis for an award of fees to the Capac-chione plaintiffs on the sole issue on which they have prevailed, namely the unitary status determination. Although a majority of this Court has regrettably, and we believe mistakenly, determined that CMS has attained unitary status, no member of the Court suggests that in doing so, or in not doing so sooner, CMS violated 42 U.S.C. §§ 1981, 1983, 2000d, the Fourteenth Amendment of the Constitution, or any other law or constitutional provision that would give rise to an award of attorney’s fees under § 1988 or any other statute.[29] While some of the Capacchione plaintiffs had alleged that CMS’s failure to obtain a declaration that it had attained unitary status violated their constitutional rights, Judge Potter never so held. Tellingly, on appeal, the Capacchione plaintiffs do not assert this position, let alone offer any support for it. Nor does any member of this Court embrace this unprecedented theory. Thus, there is no basis for an award of attorney’s fees here.
We note that, even if § 1988 somehow applied to a mere finding of unitary status, absent some additional finding of a constitutional or civil rights violation, the Capac-chione plaintiffs would still not be entitled to attorney’s fees because they do not qualify as “prevailing parties].” In order to be a “prevailing party,” a party seeking fees must have obtained “an enforceable judgment ... consent decree or settlement.” Farrar v. Hobby, 506 U.S. 103, 111, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). Additionally, there must be some defendant in the case who has been “prevailed against,” id. at 109, 113 S.Ct. 566, with a resulting “material alteration of the legal relationship” between that defendant and the party seeking fees, id. at 111, 113 S.Ct. 566.
This prevailing party requirement is crucial: in Buckhannon, the Supreme Court rejected the so-called “catalyst theory” of attorney’s fees on the ground that it might permit an award “where there is no judicially sanctioned change in the legal relationship of the parties.” Buckhannon, 121 S.Ct. at 1840. By simply obtaining a declaration that the Board has achieved unitary status, the Capacchione plaintiffs have not obtained “an enforceable judgment, consent decree, or settlement;” they have not “prevailed against” CMS; nor have they effected a “material alteration of the legal relationship” between the parties.
Indeed, the declaration of unitary status merely restores the parties to the status quo prior to the issuance of the desegregation decree. Such a declaration does not constitute “an enforceable judgment” for the Capacchione plaintiffs. The dissent is mistaken in its assertion that a unitary status declaration is “enforceable against *415 CMS in the unlikely event it later attempts to continue prior assignment policies.” Traxler Op. at 68. Any challenge to future race-based assignment policies would be on the ground that they violate the Constitution, not that they violate a declaration of unitary status. Thus, a future challenge would seek to “enforce” the Constitution, not the unitary status determination. This point highlights the heart of the dissent’s misunderstanding. Section 1988 exists to provide attorney’s fees for those plaintiffs who demonstrate that they suffered deprivations of rights under federal civil rights laws or the Constitution. Today, a majority of this Court has held that the Capac-chione plaintiffs have suffered no such deprivation; thus, they are not entitled to statutory attorney’s fees.
Although the declaration of unitary status represents a rejection of the legal position that CMS has taken in this litigation, such a defeat is not tantamount to being “prevailed against” under § 1988. See Buckhannon, 121 S.Ct. at 1841 (“We cannot agree that the term ‘prevailing party’ authorizes federal courts to award attorney’s fees to a plaintiff who ... has reached the ‘sought-after destination’ without obtaining any judicial relief.”). Rather, the primary significance of a declaration of unitary status is that CMS has been successful; it has eradicated the vestiges of past discrimination to the extent practicable and, as the Capacchione plaintiffs put it, obtained a “return of control to local authorities.” Brief of Appellees at 34. The Board, upon a declaration of unitariness, now actually has wider latitude to assign students than it did while it was under court order to remedy past discrimination (although certain race-conscious policies might no longer be permissible). Accordingly, this declaration of Board success, and attendant broadening of the Board’s discretion, does not constitute an alteration of the parties’ legal relationship “in a way that directly benefits the plaintiff.” Farrar, 506 U.S. at 112, 113 S.Ct. 566 (emphasis added). Without more, the declaration that CMS has achieved unitary status does not place any direct benefit on the Capacchione plaintiffs, who “obtain[ ] nothing from the defendants.” Hewitt v. Helms, 482 U.S. 755, 761-62, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987).[30]
Moreover, “only those changes in a defendant’s conduct which are mandated by a judgment ... in the case at bar may be considered by the court in determining the plaintiffs success at trial” for purposes of attorney’s fees under § 1988. Clark v. Sims, 28 F.3d 420 (4th Cir.1994) (emphasis added). In affirming the district court’s unitary status determination, this Court does not mandate that CMS engage in any “conduct” whatsoever, but simply holds that “CMS has complied in good faith with the mandate of Brown,” and that the “dual system has been dismantled.” Traxler Op. at 43. By vacating the award of nominal damages and injunctive relief, this Court has removed any “mandate” on the actions of the district court. Having been determined to be unitary, CMS is now free to take whatever action it wishes consistent with the Constitution.
Thus, the Capacchione plaintiffs’ suit seeking a declaration of unitary status was *416 not an “action to enforce” the civil rights laws under § 1988. Rather, these plaintiffs sought a declaration that CMS has complied with judgments obtained by the Swann plaintiffs in previous actions to enforce civil rights. Although the Capac-chione plaintiffs brought separate § 1983 claims asserting that the expanded magnet schools program violated the Equal Protection Clause, they have not “prevailed]” on those claims.
In sum, not only is there no statutory authority to award attorney’s fees here, but even if such authority were present, the Capacchione plaintiffs are not prevailing parties under § 1988. For these reasons, there is no basis for an award of any attorney’s fees in this case.
VII.
Finally, CMS appeals the district court’s order awarding sanctions — including legal fees and costs — -to the Capacchione plaintiffs arising from a discovery dispute. In the months before trial, CMS did not respond to interrogatories by the Capac-chione plaintiffs seeking disclosure of fact witnesses. Instead, the Board waited until the week before trial to reveal the names of most of its fact witnesses, providing the Capacchione plaintiffs with a list of 174 names which it ultimately narrowed to twenty-six potential witnesses. The Board maintains that its actions complied with the district court’s pretrial order, which required the parties to provide a list of fact witnesses to each other “[n]o later than the morning of the first day of trial.” J.A. 150.
The district court, however, granted the Capacchione plaintiffs’ motion for sanctions. The court held that it had established the rules for disclosure of fact witnesses in an order of September 1998, which superseded the pretrial order. The September 1998 order denied the Capac-chione plaintiffs’ motion to compel disclosure of witnesses prior to the date established in the pretrial order for disclosure of expert witnesses, but the court stated that “CMS must supplement its responses, as it promised, when such information becomes known.” J.A. 195. In awarding sanctions, the district court also indicated its concern that CMS had been “lacking candor in disclosing relevant and important information” during the pretrial stage, that the disclosure of a list of 174 potential witnesses in the week before trial was “extremely prejudicial to opposing counsel,” and that many of the witnesses on the list may have been “irrelevant or unnecessarily cumulative.” J.A. 305. As a result, the district court ordered a one-week recess after the Capacchione plaintiffs’ presentation at trial to allow them to depose, at the school system’s expense, any of the twenty-six witnesses on the Board’s revised list. Witnesses whom the Board did not make available for deposition or interview during the mid-trial recess were barred from testifying.
“Rule 37(d) of the Federal Rules of Civil Procedure gives the district court wide discretion to impose sanctions for a party’s failure to comply with its discovery orders.” Mutual Fed. Sav. & Loan Ass’n v. Richards & Associates, Inc., 872 F.2d 88, 92 (4th Cir.1989). CMS could plausibly have understood the deadline for disclosure of fact witnesses contained in the pretrial order to have continued in effect after the subsequent September 1998 order given that the subsequent order’s central effect was to reaffirm the deadline contained in the pretrial order for disclosure of expert witnesses. Nonetheless, we cannot say that the district court abused its broad discretion in finding that its September 1998 order did in fact supersede the pretrial order, and that the Board’s pretrial conduct had been unnecessarily *417 dilatory and prejudicial to the Capacchione plaintiffs. Therefore the order of sanctions against CMS must be affirmed.
VIII.
We must and do sympathize with those who are impatient with continued federal court involvement in the operation of local schools. One might consider thirty-five years a long time for a school district to operate under judicial desegregation decrees. However, when the Supreme Court decided Swann in 1971 no one could reasonably have thought that the substantial task described there would be quickly or easily accomplished. CMS, which maintained a separate, decidedly unequal dual educational system for decades — and which mightily resisted desegregation of any sort for years after it became the law of the land — has come a long way. Although CMS has now achieved unitary status in certain respects, the record in this case simply does not support a determination that the process of desegregation is at an end.
For more than a hundred years, in fits and starts, our nation has attempted to undo the effects of its shameful heritage of slavery. For nearly fifty years, federal courts have struggled with the task of dismantling legally enforced racial segregation in many of our schools. This task has given rise to one of the preeminent issues of constitutional law in our time. We do not yet know how history will regard the courts’ role in adjudicating and presiding over the desegregation of schools. It may be seen as a brief and unfortunate jurisprudential anomaly, justified only by the immediacy of the evil it was intended to uproot, cf. Freeman, 503 U.S. at 505-07, 112 S.Ct. 1430 (Scalia, J., concurring); or it may be recognized as the necessarily sustained effort to eradicate deep-seated vestiges of racial discrimination and to vindicate the promise of the Fourteenth Amendment, cf. Dowell, 498 U.S. at 266-68, 111 S.Ct. 630 (Marshall, J., dissenting); or it may be viewed in some other way that we cannot now anticipate.
But we are certain that the end of this great task must be accomplished in an orderly manner, consistent with and true to its origin. We are certain, too, that if the courts, at some point, come to view the effort to eliminate the vestiges of segregation as having been overly “race-conscious,” they must do so with a clear assessment of the historical record.
Race neutrality, of course, represents one of our constitutional ideals. Properly understood, it is an ideal not at all in tension with our obligation as a society to undo the effects of slavery and of the racial caste system that was perpetuated, for more than a century, in slavery’s wake. But we must be ever mindful, as we strive for race neutrality, that a reductive and willfully a historical conception of race neutrality was, in an earlier era, used as a blunt instrument against the aspirations of African-Americans merely seeking to claim entitlement to full citizenship.
In striking down early civil rights legislation, the Supreme Court embraced this misconceived race neutrality, reasoning, only twenty years after the issuance of the Emancipation Proclamation, that the legislation at issue would illegitimately make black citizens “the special favorite of the laws.” Civil Rights Cases, 109 U.S. 3, 25, 3 S.Ct. 18, 27 L.Ed. 835 (1883). Indeed, the system of segregation with which we are concerned was justified at its inception by a particular conception of race neutrality — that a regime of racial separation could be constitutionally justified so long as it applied neutrally and equally to persons of all races. See Plessy v. Ferguson, 163 U.S. 537, 551, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (“We consider the underlying *418 fallacy of the plaintiffs argument to consist in the assumption that the enforced separation of the two races stamps the colored race with a badge of- inferiority.”).
The first Justice Harlan, dissenting in Plessy, declared our Constitution to be “color-blind,” id., 163 U.S. at 559, 16 S.Ct. 1138, and in doing so provided one of the most famous and compelling articulations of the constitutional guarantee of equality. But in urging us to be “blind” to race, Justice Harlan did not, as is sometimes suggested, suggest that we be ignorant of it. In Plessy, he was the only member of the Court willing to acknowledge the most obvious truth about segregation: “Everyone knows that the statute in question had its origin in the purpose, not so much to exclude white persons from railroad cars occupied by blacks, as to exclude colored people from coaches occupied or assigned to white persons.” Id. at 557, 16 S.Ct. 1138. Thirteen years earlier, dissenting in the Civil Rights Cases, Justice Harlan rejected the notion that civil rights legislation made blacks a “special favorite of the laws,” id., 109 U.S. at 61, 3 S.Ct. 18, and he criticized the majority’s reasoning as “narrow and artificial.” Id. at 26, 3 S.Ct. 18.
We recognize now, as Justice Harlan recognized then, that no simple syllogism can enfold all of history’s burdens and complexities. Eliminating race-consciousness from government decision making must be regarded as among our worthiest constitutional aspirations. But that aspiration surely cannot be so rigid that it refuses to distinguish the “race consciousness” that created a segregated school system and the race-conscious efforts necessary to eliminate that system. While most judges are not historians, we must be willing to acknowledge and confront our history. If we fail to do so, we risk falling into a mode that equates the cure with the disease: civil rights with favoritism, desegregation with segregation. As American citizens, we know better.
We are honored to state that Judge Michael and Judge Gregory join in this opinion.

. In the course of its opinion in Swann, the Court stated that a school board, as opposed to a federal court, would possess the discretionary power to direct that its schools maintain “a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole.” 402 U.S. at 16, 91 S.Ct. 1267. Both Judges Motz and Wilkinson seize upon this passage as if it supported their holding that the School Board's imposition of fixed quotas was permissible. Of course, as even the School Board realizes, this is misplaced reliance, for whether or not the Board possessed independent authority to impose the rigid quotas is entirely irrelevant to the only question before us of whether the Board is entitled to immunity because it was acting upon order of the district court.

. The petitioners in Swann, like the School Board, also argued that Judge McMillan neither intended nor imposed a quota in his desegregation order. In a construction of the district court's order that not only tracked the order's unambiguous language, but was ultimately adopted by the Supreme Court, peti-doners maintained that the court employed the 71% 29% ratio merely as a "starting guide,” "a specific, yet flexible goal,” " 'expressed a willingness to accept a degree of modification,' ” and " 'departed from it where circumstances required.' " Petitioners' Br., at 36, 38, 66.

. Since this case was first filed in 1965, the various successor plaintiffs have been referred to as the Swann plaintiffs, a practice we continue to observe here.

. For clarity's sake, we will often refer within to the presiding district judge by name.

. CMS used "satellite zones" in connection with elementary schools. Under this method, students from a small geographic area located outside an elementary school's primary attendance area were assigned to that school. J.A. 15571, 16052; see also Swann, 402 U.S. at 9 & n. 3, 91 S.Ct. 1267. The use of satellite zones was implemented by "pairing” elementary schools — students from a predominantly black neighborhood were bused to a school in a predominantly white neighborhood for grades K-3, and students from a predominantly white neighborhood were bused to a school in a predominantly black neighborhood for grades 4-6. J.A. 15571, 16052; see also Swann, 402 U.S. at 9-10, 91 S.Ct. 1267.

. Since filing suit, the Capacchiones have moved to California. Based on that fact and other findings, the district court determined that William Capacchione no longer possessed standing to seek injunctive or declaratory relief, but that he did have standing to pursue compensatory relief. Capacchione v. Charlotte-Mecklenburg Schs., 57 F.Supp.2d 228, 240 (W.D.N.C.1999). Another group of white parents intervened in the consolidated action and that group, represented by plaintiff Michael Grant, claimed that CMS has achieved unitary status. The various groups of plaintiffs that have joined in Capacchione's claims are hereinafter referred to as "the Ca-pacchione plaintiffs.”

. For convenience, we refer to the original Green factors and any ancillary factors identified by the district court as "Green factors.”

. Judge Potter also chided CMS for proffering the Remedial Plan "after the deadline for fact discovery and expert witness discovery had expired.” On the contrary, CMS fulfilled all of its duties under the federal rules, appropriately supplementing its responses to discovery requests as soon as the Remedial Plan had been adopted. Furthermore, a more precipitant proposal could not have incorporated the various expert perspectives developed during discovery. A similar plan submitted earlier in the course of the litigation necessarily would have been based largely on speculation and supposition, and therefore would have been *383 far less useful and pertinent. As it was, the Plan was tendered in advance of the non-jury trial, and, of great significance, almost five months before the district court issued its decision. Neither the court nor the parties could have been inconvenienced by the necessary timing of the Remedial Plan’s submission.

. Taking the district court at its word that the only question before it initially was the extent of the Board's compliance with the prior desegregation orders, the Remedial Plan was nonetheless highly relevant for even that purpose. The ease with which some of the proposed Plan remedies could be realized, e.g., merely distributing available funding to address the stark disparity in basic resources such as instructional materials and media centers, see J.A. 11040, strongly suggests that the Board had not fully implemented the long-standing dictates of the prior orders. The court nonetheless observed that "while the goal of perfect compliance with court orders has remained elusive, no evidence has been presented that school authorities were guilty of easily correctable errors.” Capacchione, 57 F.Supp.2d at 283. To the contrary, the Plan thoroughly documented the Board's failings and the facility with which they could be rectified. The district court simply chose to ignore this highly relevant evidence.

. Though we need not grant CMS the same deference afforded the promulgations and adjudications of a federal administrative agency, the formal declarations of its governing Board "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.” Ritter v. Cecil County Office of Housing & Community Dev., 33 F.3d 323, 328 (4th Cir.1994) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

. Judge McMillan’s final desegregation order mandated, inter alia, that no school should become "racially identifiable.” Swann, 311 F.Supp. at 268. Judge Potter interpreted the phrase synonymously with "racially imbalanced,” which, as noted within, describes a school with an African-American student population deviating more than fifteen points in either direction from the county-wide norm. See Capacchione, 57 F.Supp.2d at 246.

. Judge Potter incorrectly declared that "Martin was not a unitary status hearing!.]” Capacchione, 57 F.Supp.2d at 250. In fact, as the accompanying text indicates, the white parents in Martin contended, as the Capac-chione plaintiffs do today, that CMS had achieved unitary status. Intervening African-American parents, like those herein, maintained to the contrary. In actuality, there is little difference between today's case and Martin, and Judge McMillan’s findings in the latter are as binding on the parties as any others made in the course of this litigation.

. The strategies described in the Remedial Plan would be of particular help in deciding whether practicable measures are available. The Plan proposes, among other things, to divide Mecklenburg County into three to five demographically similar “clusters,” within which students may choose to attend any school, magnet or otherwise. Where the demand for a given school exceeds the available room, spots would be assigned by lottery based on factors such as proximity, sibling attendance, and racial, ethnic, and economic diversity. The Plan also outlines a formal mechanism to disseminate information regarding the enrollment process, and it provides that the Board will work with the business community and local government to secure subsidies for disadvantaged families wishing to relocate to areas in which low-cost housing is scarce. See J.A. 11053-59.

. However, if a district court retains jurisdiction over one or more Green factors, it may, upon a proper showing, reassert control over a factor previously adjudged to have attained unitary status. Freeman, 503 U.S. at 508-09, 112 S.Ct. 1430 (Souter, J., concurring).

. The district court found that the expert called on behalf of the Capacchione plaintiffs, Dr. David J. Armor, could offer no reliable testimony on the subject. See Capacchione, 57 F.Supp.2d at 264.

. It has been famously said (by either Mark Twain or, earlier, Benjamin Disraeli, depending on one’s source), "There are three kinds of lies — lies, damned lies and statistics.” A common difficulty in dealing with statistics is illustrated by the district court's analysis of Dr. Gardner's study. The court first noted that, of the four schools scoring in the lowest category, two were in Group 1 and two were in Group 3. Capacchione, 57 F.Supp.2d at 264-65. Next, the court observed that the two highest ratings accorded elementary schools were again split between Groups 1 and 3. Id. at 265. Based on this selective culling of the data, the lower court concluded that "the results of Dr. Gardner’s analysis do not show disparities along racial lines.” Id. at 264.
The forest that is CMS is not sufficiently mapped by the documentation of a few trees. We could accurately say, for example, that omission from Group 1 of the brand-new elementary school referred to by the district court as having one of the highest ratings would lower the Group 1 average by more than a full point. Or we could state without error that seven of the twenty-three Group 1 schools (more than 30 percent) scored below 50, while only five of the forty Group 3 schools (12.5 percent) scored similarly. Indeed, we note that none of the Group 1 high schools scored higher than 46, yet all those in Groups 2 and 3 scored at 50 or above. Of course, one would rightly view this latter declaration with some skepticism once it became known that there are but fourteen high schools in CMS, only two of which were included by Dr. Gardner in Group 1.
The pick-and-choose method gets us nowhere. The value of Dr. Gardner's research lies in the general conclusions that can be drawn from the entirety of the data. The most obvious conclusion is that, as a general matter, imbalanced-black schools in CMS are in worse shape than those attended by larger proportions of white students. Once we accept that premise, the lone remaining question of any significance is "Why?”

. The district court made no findings as to whether practicable remedies exist with respect to facilities. In light of the court's refusal to consider the Board's proposed five-year Remedial Plan, it cannot be determined in the first instance whether practicable remedies to the current disparities exist. We note, however, that the Remedial Plan specifically identifies disparities associated with race in baseline needs for schools' instructional materials and media centers, and the lack of any standardized criteria to evaluate the adequacy of these resources. J.A. 11037-38. The Plan proposes to achieve uniformity in resources across schools by imbalanced allocations that reflect the schools' current resource gaps and imbalances. J.A. 11038-40. Likewise, the Remedial Plan identifies disparities associated with race in the instructional facilities, and proposes building replacements or renovating existing facilities for sixteen schools that are either racially identifiable as black or are located in a predominantly black census tract. J.A. 11041-42. Uniform building maintenance standards and procedures are proposed. J.A. 11043. Monitoring, evaluation, and develop *394 ment of appropriate criteria for evaluation are also proposed to maintain equity across the school system’s resources and facilities. J.A. 11038-40, 11042-43.

. Pursuant to Freeman, the district court accepted the invitation of the Board and the Swann plaintiffs to consider whether vestiges of official discrimination remain concerning the ancillary factors of student achievement and student discipline. The court found in the negative, concluding that CMS had attained unitary status in both areas. We agree that the district court’s judgment regarding student discipline should be affirmed.
With respect to the ancillary factor of student achievement, however, we would vacate Judge Potter’s holding that unitary status had been achieved. Judge Potter found that disparities in student achievement existed but that the disparities (1) were not vestiges of de jure segregation and (2) could not be remedied by any practicable measure. Capacchione, 57 F.Supp.2d at 280-81. An analysis of disparities in student achievement may only be appropriate once the school system has achieved unitary status in other respects. See Swann, 306 F.Supp. at 1309 ("Until unlawful segregation is eliminated, it is idle to speculate whether some of this [achievement] gap can be charged to racial differences or to socio-economic-cultural’ lag.”). At the very least, student achievement in this case is inextricably intertwined with the other Green factors, particularly student assignment. Therefore, for reasons akin to those discussed in our analysis of the Green factor of transportation, we would likewise conclude that the student achievement factor requires further consideration.

. While the Remedial Plan does not specifically address transportation as a Green factor, it does propose siting new schools in a manner calculated to promote racial balance in CMS. J.A. 11042. If CMS chooses sites for new schools that are more accessible to the majority of the black population, we presume that fewer black students would have to be bused to the suburbs for purposes of desegregation. A new approach to school siting would address the vestiges of past discrimination, if such vestiges remain, in those areas in which CMS has not yet achieved unitary status.

. The district court considered a particular school to be racially imbalanced if its proportion of African-American students varied more than fifteen percent from the district-wide average. In 1998-99, African-Americans represented 42.7% of the elementary students in CMS, 41.7% of the middle school students, and 39.6% of the high school students. J.A. 11574. An elementary school would therefore be designated imbalanced-black if more than 57.7% of its students are African-American; conversely, if African-Americans constituted less than 27.7% of the student body, the school would be designated imbalanced-white.

. Even if the pattern of faculty assignments were somehow shown to be a vestige of past official discrimination, the evidence before the district court casts substantial doubt upon the Board’s ability to effect a practicable remedy. See Capacchione, 57 F.Supp.2d at 258-59:
CMS runs the risk of losing significant numbers of teachers if its faculty assignment policies become too restrictive.... Another practical problem faced by the district is the fact that it must constantly hire thousands of new teachers in the midst of a national teacher shortage .... [which] is especially pronounced with regard to black teachers, particularly in this region of the country.

. Although the Board’s official position, as outlined in its Remedial Plan, is that remediable vestiges of de jure segregation do remain as to faculty assignments and quality, the clear weight of the evidence is to the contrary. The district court's failure to consider the Plan was therefore harmless in this narrow respect.

. We review the district court's factual findings for clear error and its legal conclusions de novo. See Freeman, 503 U.S. at 474, 112 S.Ct. 1430; United States v. Texas, 158 F.3d 299, 306 n. 8 (5th Cir.1998); Little Rock Sch. Dist. v. North Little Rock Sch. Dist., 109 F.3d 514, 516 (8th Cir.1997).

. The dissent’s suggestion that this holding in Swann was somehow abrogated by Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 283, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) and City of Richmond v. J.A. Croson Co., 488 U.S. 469, 494, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) is baffling. Neither case overruled, explicitly or implicitly, the Swann Court's authorization for this school board to assign students according to a "prescribed ratio.” Swann, 402 U.S. at 16, 91 S.Ct. 1267. This is not an instance in which CMS is attempting to extend an analogous Supreme Court holding to fit its own needs. Rather, the Supreme Court authorized CMS's actions specifically, and that authorization has never been overruled. As such, CMS is entitled to follow it. See infra, at part III.C.

. Judge Potter recognized that the optional schools "were similar to today's magnet *403 schools,” both having "countywide enrollment and a racial balancing target.” Capacchione, 57 F.Supp.2d. at 286. He nonetheless concluded that the schools established after 1992 under the expanded magnet schools program "differ from optional schools in that [the new] magnets offer specialized curricula and thereby confer a benefit above and beyond the regular academic program.” Id. at 286-87 n. 49. The dissent allies itself with this view, Traxler Op. at 49, but nothing in the record offers any support for it. To the contrary, assuming arguendo that "specialized curricula” constitute a "benefit,” the magnet schools instituted after 1992 provide precisely the same "benefit” as the pre 1992 "optional schools.” See J.A. 10552 (proposed 1992 pupil assignment plan recommending continuation of six magnet schools already in place); J.A. 15504 (1993 letter noting that magnet schools were called "optional schools” prior to 1992); J.A. 10651 (Summary of Findings From Research on Magnet Schools explaining that "[o]ur optional schools function as magnet schools”); J.A. 13606, 15581 (Stolee Plan explaining that “[t]he traditional schools presently existing in Charlotle-Mecklenburg are good examples” of curriculum specialty schools, "sometimes called magnet schools”). After all, it was only because the optional schools did offer certain "specialized curricula” that parents (including Michael Grant, one of the Capacchione plaintiffs, J.A. 2489) were willing, well prior to the 1992 expanded magnet schools program, to enroll their children in desegregated optional schools. See J.A. 13641, 15616. In fact, the original six "open” and "traditional” schools remain among CMS's more heavily subscribed magnets. See J.A. 10292-340. Myers Park Traditional, for example, had 245 students on its waiting list for the 1998-99 school year. See J.A. 2159.

. The dissent's contention that Judge McMillan "cautio[ned]” CMS against creating optional schools because the schools were marked by "failure” flies in the face of the court orders. Traxler Op. at 49. In fact, the only warnings that Judge McMillan gave regarding optional schools were against repeating the past “failure” to provide adequate transportation and against failing to provide "adequate safeguards against discriminatory *404 results,” so as to prevent optional schools from "resurrecting]” "freedom of choice” plans under a new name. Swann, 379 F.Supp. at 1103-04.
Moreover, the dissent’s heavy emphasis on Dr. Stolee’s recommendation to the Board that it seek court approval of the expanded magnet schools program is puzzling. That one advisor should suggest this does not change the facts, and the critical facts here are that the expanded magnet schools program was simply an expansion of the court-appointed optional schools. Even if this were not so, the Board's decision to ignore a recommendation from one educational adviser (not a lawyer) on a legal matter certainly does not evidence the Board's bad faith or render its action violative of any court order.

. The dissent, see Traxler Op. at 50, makes much of Judge McMillan’s 1970 instruction that "leave of the court be obtained before making any material departure from any specific requirement set out herein,” Swann, 311 F.Supp. at 270. But the dissent fails to acknowledge that this statement followed Judge McMillan’s declaration that the Board had "maximum discretion ... to choose methods that will accomplish the required result.” Id. The "material departure” provision was not an attempt to limit the Board’s ability to choose its own methods to move aggressively forward with the desegregation of its schools, but rather was a message that this previously recalcitrant school district should not use its “discretion” to take steps backward, i.e., a “material departure,” from its obligation to achieve the court-ordered "goal” of "complete desegregation of the entire system to the maximum extent possible.” Swann, 306 F.Supp. at 1298-99.

. Tellingly, the dissent does not even mention this argument.

. The Capacchione plaintiffs contend that, given the obvious concern of school officials with demographic changes, "CMS could not have been motivated by any desire to comply with its court-ordered duty to eradicate vestiges of segregation." Brief of Appellees at 85. But this stands the analysis on its head. A court determines from the effect of their acts, not from their motives, whether school authorities comply with a desegregation decree. See Wright v. Council of Emporia, 407 U.S. 451, 462, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972) ("It is difficult or impossible for any court to determine the sole or dominant motivation behind choices of a group of legislators, and the same may be said of the choices of a school board.... Thus we have focused upon the effect — not the purpose or motivation — of a school board’s action in determining whether it is a permissible method of dismantling a dual system.") (internal quotations marks omitted). Moreover, even if motivation were relevant, the argument would fail. A fair reading of the record demonstrates that although school officials were obviously aware of the demographic shifts, they viewed these shifts as an obstacle to achieving compliance with the Swann orders and to eliminating the vestiges of discrimination in the school system, not as the condition that itself necessitated a remedy. See, e.g., J.A. 13597-98, 15572-73 (Stolee Plan identifying "a growing and moving population” as one of several factors creating instability in student assignment under the pre 1992 system of pairing and satelliting); J.A. 15504 (1993 letter from CMS to the U.S. Department of Education listing "demographic and residential patterns" as one of several increasing strains on the pairing system); J.A. 2712 (testimony of former CMS Superintendent John Murphy that "[w]e really weren’t going to be bringing about desegregation and racially balanced schools unless we began to address the issue of housing at the same time.”). The Board may have chosen sites for new schools in response to, or even in furtherance of, these demographic trends, see supra, but in any event the Board also clearly evidenced awareness that the population changes, particularly the greater distance between white and black population centers, would put a greater strain on the process of desegregation.

. Contrary to the dissent’s contentions, CMS did not concede that if the Grant intervenors obtained only a declaration of unitary status, without an injunction or determination that CMS violated the Constitution, they would be entitled to attorney's fees. CMS actually stated:
Unlike Capacchione, the Grant intervenors were granted declaratory and injunctive relief related to the issues of unitary status and CMS’ magnet school admission policies. Therefore, the entitlement of the Grant in-tervenors to recover attorneys’ fees is tied directly to the merits of those claims.
Brief of Appellants at 40 (emphasized language omitted in dissent, see Traxler Op. at 66). Of course, no plaintiff prevailed on the claim that the “magnet school admission policies" violated the Constitution, or any other claim that provided a statutory basis for attorney’s fees. Moreover, even if CMS had conceded to the contrary, there would be no basis for a fee award.

. We note that if CMS itself had succeeded in simply obtaining a declaration that its school system was now unitary, no one would contend that the Board would be entitled to an award of fees. Given this, how can the Capacchione plaintiffs, operating as a "private attorneys general” on behalf of the Board, Traxler Op. at 68, be entitled to fees?

. The dissent’s contention that the Capac-chione plaintiffs helped "in making unitariness a reality” underscores the dissent’s confusion as to the difference between seeking injunctive relief to eliminate illegal segregation connected with a dual school system with a declaration that this has been done. The former is an action to "enforce” civil rights laws and the Constitution — and therefore contemplated by § 1988 — and the latter is a statement that earlier enforcement efforts have succeeded for reasons having nothing to do with the Capacchione plaintiffs' lawsuit.